### McCANNON v. McCANNON et al.
### (No. 8975.)

Court of Civil Appeals of Texas. Galveston. Nov. 10, 1927.

Rehearing Denied Feb. 16, 1928.

1. Wills ⬅55(7)—In considering evidence of aged testator's mental capacity, court should be controlled by reasonableness of will and knowledge of property and objects of bounty rather than lapse of memory and idiosyncracies common in old people.

In determining whether finding that aged testator did not have sufficient mental capacity to make valid will is against weight of evidence, court should give little probative force to lapse of memory and idiosyncracies to which old people often fall heir, but should be controlled by testator's acts connected with execution of will, reasonableness of its provisions, and ability to detail nature and extent of property and know objects of bounty.

2. Wills ⬅50—In determining "testamentary capacity," issue is whether testator understood nature and extent of property, objects of bounty, and disposition of property.

Issue as to testamentary capacity is, not whether testator was of "sound mind," but whether he was capable of understanding that he was making will, nature and extent of property, objects of bounty, and disposition he was making of property.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Testamentary Capacity.]

3. Wills ⬅324(2)—Courts will carefully scrutinize evidence of testamentary capacity to determine whether it is jury question.

Courts will scrutinize evidence of testamentary capacity with searching, though impartial, eye to ascertain whether it is sufficient basis for submission of question to jury, since courts are fond of sustaining wills, and juries often seize opportunity to break them.

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**4. Wills ⚖══55(7)—Evidence held insufficient to support judgment refusing will to probate for mental incapacity of aged testator.**

Evidence of testamentary incapacity *held* insufficient to support judgment refusing will to probate, where aged testator, having made advancements to children during lifetime, left half of property to wife.

**5. Wills ⚖══53(9)—In will contest on ground of mental incapacity, in which children claimed unjust discrimination in favor of testator's wife, receipts and deed showing advances to children held admissible.**

In will contest on ground of mental incapacity, refusal to admit receipts and deed showing advances to testator's children, and that sons were owners of considerable property, *held* error, since such evidence was admissible to rebut inference asserted by children that *unequal distribution* had been made by will with unjust discrimination in favor of testator's wife.

On Motion for Rehearing.

**6. Wills ⚖══404, 413—Executrix held entitled to attorney's fees and costs in will contest (Rev. St. 1925, arts. 2056, 2066).**

Executrix, acting in good faith in offering will for probate, *held* entitled to attorney's fees and costs in will contest, even though probate of will be refused, notwithstanding Rev. St. 1925, art. 2056, since, under article 2066, courts may for good cause adjudge costs otherwise, and it was duty of executrix to see that will was offered for probate.

Graves, J., dissenting.

Appeal from District Court, Harris County; W. E. Monteith, Judge.

In the matter of the estate of D. S. McCannon, deceased. Will contest by D. E. McCannon and others was carried by appeal to the district court, and judgment rendered refusing the will to probate. From such judgment, Mrs. Hannah J. McCannon appeals. Reversed and remanded.

Morris, Sewell & Morris and Cole, Cole & O'Connor, all of Houston, for appellant.

Homer E. Stephenson, of Houston, for appellees.

LANE, J. On the 26th day of July, 1924, D. S. McCannon, now deceased, executed the following instrument:

"State of Texas, County of Harris.

"Know all men by these presents:

"That I, D. S. McCannon, of Harris county, Texas, being of sound and disposing mind and memory, and being desirous to settle my worldly affairs while I have strength to do so, do make this my last will and testament, hereby revoking all others heretofore made:

"I. I desire and direct that my body be buried in a decent and Christianlike manner, suitable to my circumstances and condition in life.

"II. I desire and direct that my just debts be paid out of my estate without undue delay, by my executrix, to be hereinafter appointed.

"III. After the payment of all my just debts with which my estate is legally chargeable, then I devise and bequeath to my beloved wife, Hannah J. McCannon, a full one-half of all my property, real, personal and/or mixed, and of every kind and character whatsoever and wherever the same may be situated.

"IV. I devise and bequeath to my beloved children and their descendants as hereinafter stated, in equal shares, the other one-half of my property, whether real, personal and/or mixed, of every kind and character whatsoever, and wherever the same may be situated.

"(1) One share to my grandchild, Lowe Park Stanton, the wife of R. O. Stanton, of Numa, Iowa, she being the daughter of my deceased daughter, Jeanette McCannon Parks;

"(2) One share to my son, George T. McCannon, who lives in the Rio Grande Valley, Texas;

"(3) One share to my two grandsons, Carl and Lawrence McCannon, of Plano, Iowa, the surviving children of my deceased son, Robert McCannon;

"(4) One share to my son, Charles McCannon, of Marion, Iowa;

"(5) One share to my daughter, Cora B. Coleman, the wife of Charlie D. Coleman, of Olin, Iowa;

"(6) One share to my son Dan E. McCannon, of Beaumont, Texas;

"(7) One share to my son, LeRoy McCannon who lives in Texas;

"(8) One share to my daughter, Grace McDaniel, the wife of Harry McDaniel.

"I hereby provide that if any of my above children should die before I do, leaving surviving them child or children, that such child or children shall take the share which their father or mother would otherwise have taken had they been living when I die; and if through inadvertance or otherwise, I have not properly named the respective grandchildren hereinabove named, and should there be other grandchildren than those stated, or should their names be technically different than those stated, it is my desire that any surviving child or children of any of my children shall take the share which my child would take if alive.

"If any of my children should die before I die leaving no heirs of their body, then the share which they otherwise would have taken if alive at my death, shall go equally to such of my children or their survivors as may be alive at the time I die; no grandchildren in any event taking more between them than the share their respective parent would have taken if he or she may have been alive when I die.

"V. My estate consists principally of real estate in Harris county, Texas; and I have a vendor's lien note due me on my farm in Iowa, on which there is a principal amount at this time due of around seventy-four hundred ($7,400.00) dollars, and which note is in a bank at Numa, Iowa. By mentioning these my principal assets, I do not intend it to be an all inclusive inventory, but merely as a matter of record to set out where and of what my principal estate consists.

"VI. I hereby constitute and appoint my beloved wife, Hannah J. McCannon, as the independent executrix of this, my last will and testament, and direct that no bond or security be required of her as such executrix.

"VII. It is my will that no other action shall

⚖══For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

be had in the county court in the administra-
tion of my estate than to prove and record
this will and to return an inventory and list of
claims, when my estate shall be dropped from
the docket.

"In testimony whereof, I have hereto set my
hand, at Houston, Texas, on this the 26th day
of July, A. D. 1924.          D. S. McCannon.

"Signed, declared and published by D. S. Mc-
Cannon as his last will and testament, in the
presence of us, the attesting witnesses, who
have hereto subscribed our names in the pres-
ence of said D. S. McCannon, at his special in-
stance and request, this the 26th day of July,
A. D. 1924.          Robert L. Cole.
          "Lena Killingsworth."

D. S. McCannon died in Houston, Harris
county, Tex., on October 20, 1924. The will
above shown was admitted to probate by the
county court of Harris county over the con-
test of D. E. McCannon, made for himself and
other heirs at law of D. S. McCannon, de-
ceased; the contest being based upon the al-
leged lack of testamentary capacity on the
part of the deceased and undue influence ex-
ercised over him by the proponent, surviving
wife of the deceased. The contest was car-
ried by appeal to the district court of said
county.

The cause came on for trial in the district
court before a jury, and on the 3d day of Feb-
ruary, 1926, in answer to the one issue sub-
mitted to it, the jury found that D. S. McCan-
non, at the time he executed the instrument
offered for probate, did not have sufficient
mental capacity to understand what he was
doing, to know the nature and extent of his
property, the objects of his bounty, and the
disposition made of his property.

Upon this finding of the jury, the court ren-
dered judgment refusing the will to probate,
and from such judgment Mrs. Hannah J. Mc-
Cannon has appealed.

Appellant contends: First, that the court
erred in refusing to admit the will to probate,
in that there was no evidence which raised
the question of lack of testamentary capacity
of D. S. McCannon; and, second, that the an-
swer of the jury to the sole issue submitted
is so against the great weight and preponder-
ance of the evidence as to be clearly wrong,
and manifestly the result of passion, preju-
dice, and improper motive upon the part of
the jury, and therefore the court erred in
overruling appellant's motion for a new trial.

We are not prepared to reverse the judg-
ment of the trial court, and here render judg-
ment admitting the will to probate, as re-
quested by appellant, but we think that the
contention of appellant that the great weight
and preponderance of the evidence is so clear-
ly against the verdict of the jury that it
should not be permitted to stand should be
sustained, and that the judgment should be
reversed and the cause remanded for another
trial.

[1] In determining whether the findings of

the jury that D. S. McCannon, at the time he
executed the instrument offered for probate,
did not have sufficient mental capacity to un-
derstand what he was doing, to know the na-
ture and extent of his property, the objects of
his bounty, and the disposition made of his
property, are so against the weight and pre-
ponderance of the evidence as to be clearly
wrong, we should give but little, if any, pro-
bative force to testimony tending to show that
the testator had said and done things as the
result of mere idiosyncracies to which old
people unfortunately often fall heir, or that
such aged persons had suffered a lapse of
memory to such extent that they could not
readily recognize persons whom they had met
but a short time theretofore. The acts of the
testator connected with the execution of the
will, the nature of the same, the reasonable-
ness of its provisions under the circumstances
surrounding the testator at the time of its
execution, the ability of the testator to give
in detail the nature and extent of his prop-
erty, the objects of his bounty, and, as in the
present case, the names of his living children
and grandchildren, nine in number, and the
places of their respective residences in sever-
al different states, should, we think, largely
control the determination of testamentary ca-
pacity of the testator.

[2] It must be kept in mind that the issue
is, not whether the testator was, at the time
of executing the will, of "sound mind," as that
term is generally understood in its broadest
sense, but whether or not he was capable at
such time of understanding that he was mak-
ing his will, the nature and extent of his
property, the objects of his bounty, and the
disposition he was making of his property.
Imperfect memory, caused by sickness or old
age, forgetfulness of the names of persons a
testator has known, idle questions or state-
ments, or requiring a repetition of informa-
tion, will not be sufficient to establish incom-
petency, if he has sufficient intelligence re-
maining to understand the act he was per-
forming, the property he possessed, the dis-
position he was making thereof, and the per-
sons or objects of his bounty, as said in Von
De Veld v. Judy, 143 Mo. 348, 44 S. W. 1117:

"The strongest and best proof that can arise
as to a lucid interval is that which arises from
the act itself of making the will. That I look
upon as the thing to be first examined, and if
it can be proved and established that it is a
rational act, rationally done, the whole case
is proved. What can you do more to establish
the act? * * * Here is a rational act, ra-
tionally done. In my apprehension, where you
are able completely to establish that, the law
does not require you to go further."

[3] In Huffnagle v. Pauley (Mo. Sup.) 219 S.
W. 373, 378, it is said:

"'Courts are fond of sustaining wills.' Tur-
ner v. Anderson, 260 Mo. 1, 168 S. W. 943.
Yet he has had but slight experience as a prac-

titioner who has not observed the readiness, not to say eagerness, with which juries seize an opportunity to break wills, never doubting their ability better to decide what should be done with a man's property than the man himself could do. Hence it follows that in will cases the courts scan and scrutinize the evidence with a searching, though impartial, eye, and weigh it in the scales of reason and experience, in order to ascertain whether or not it furnishes a sufficient basis for the submission of such delicate questions to a jury."

It has been well said that courts should see that a weakened intellect by reason of old age should not be mistaken for one that is lost or confounded with insanity.

Viewing the issue present from the standpoint we have indicated, as we think we should, we think the court should have granted appellant's motion for new trial.

[4] It is shown that a day or two prior to the 26th day of July, 1924, D. S. McCannon, desiring to make his will, had Robert L. Cole, his attorney, called to his home at a time when he was confined to his room on account of ill health, for the purpose of having him (Cole) prepare his will for execution; that to enable Cole to so prepare the same he gave him the information necessary to enable him to prepare the will to meet his wishes. From the data taken from the conference had with Mr. McCannon, Mr. Cole prepared the will set out in the first part of this opinion.

Mr. R. L. Cole, called as a witness, testified:

"I regarded McCannon's mind as sound at the time he signed that will. At the time I was there talking to Mr. McCannon taking this data from which to prepare the will his mind was all right; his mind apparently was just as good as it was at any time I had ever talked to him. The date on which that will was executed is the date that is on this paper here. I would not have any independent recollection as to whether it was one day in July or another. I put those dates in that will, and that is the date it was actually signed. At the time that will was signed the deceased, myself, Mrs. McCannon, his wife, and Mrs. Lena Killingsworth, the other subscribing witness, were all there in the room together."

Again:

"At the time I had the conversation with Mr. McCannon for the purpose of securing the data in order to write the will, he made some statement with reference to his children. He stated that he wanted to give his children one-half of his property, and that he wanted to give Mrs. McCannon the other half, and he brought up a matter to me of advancement that he had made to his children. He stated to me, that he had made various and sundry advancements to his children, and he discussed with me as to whether he should put in his will a provision that should show how much each one had and then equalize everything between that and their half, or whether he would simply leave them half of what there was, and let each one take it equally. He finally decided to have it drawn as it is, to give them a half. He said that he had given it to them at

2 S.W.(2d)—60

various times, had done for each one as they needed it at the time, and that they might have some squabbling between themselves as to whether one had gotten this or another had gotten that, and that for that reason he would simply leave them their half to be divided equally between them. Mr. McCannon discussed that matter in a rational manner. I had no interest whatever in how Mr. McCannon should dispose of his property, no more interest than any other client who would hire me to draw a will. No one, other than Mr. McCannon, dictated or suggested what should be put in the will that I was to draw. There was no suggestion from any one other than Mr. McCannon. On the night Mr. McCannon signed the will he was lying on a black leather couch in the right front room of his house at 1233 Yale street. He was complaining, if I am not mistaken, of his left foot; it was the one next to the window, but I am not sure which foot it was. At the time he signed the will he was sitting up. He had been either reclining or sitting on the leather couch when I was reading it to him. I read the will over to Mr. McCannon before he signed it, and, after I read it, he made no criticism of it."

Again:

"On the first visit I made to Mr. McCannon's house in regard to the will I had not seen him for some time, and I talked to him generally, just like I would talk to you or anybody else. I think I was there on that occasion for as much as an hour, and not over an hour and a half. I recall that I got to talking to Mr. McCannon about the war, and he told me he was a private in the Union Army during the Civil War. * * * During the time we were talking about those matters I did not see anything unusual about his mental condition in any way. He talked in a usual tone just like I am talking now. He had a picture up over his couch, with him sitting in the midst of his family, and I talked that over with him, and I asked him which one was his first wife. He was an old man with a lot of relatives, and he was sitting in this picture with the family, and I discussed how age would tell. Mr. McCannon discussed that, but I do not recall what was said. You do not think anything is going to come up at such times, and you don't remember all of those things."

Mrs. Lena Killingsworth, who signed the will as a witness, testified that she had known Mr. McCannon for four years prior to his death; that they lived in the same block; that at the time Mr. Cole brought the will to Mr. McCannon she happened to be at his house as a visitor; that on the occasion of the signing of the will Mr. McCannon was lying down on a couch part of the time and a part of the time sat up; that from her observation of him in the past she thought his mind was just as it had always been; that as a neighbor and frequent visitor she observed the treatment of Mr. McCannon by his wife—she was very kind to him, she cooked, kept house for him, and did a wife's duty for him, the relationship between them was kindly—that the first knowledge she had that Mr. McCannon

was going to execute a will was the night he signed it; that Mr. Cole phoned, and Mrs. McCannon answered the phone, and he asked about bringing the will and Mrs. McCannon told him it would be all right to come; that, when Mr. Cole brought the will, Mr. McCannon asked for his glasses; that Mr. McCannon was well posted on the Bible and religious matters; that she had talked with him on those subjects; that such conversation was about a month before he got sick, and his mind was all right at that time, and that she could see no difference in the condition of his mind on the day the will was executed; that Mr. McCannon was a very intelligent man to talk to, and knew the Bible as well as anybody she talked with.

Dr. William Olive, who had engaged in the general practice of medicine and surgery for many years, and who had charge of an institution in the '80's, as he expressed it, in which persons who had mental troubles were confined, testified that he had known Mr. D. S. McCannon intimately for about 5 years prior to his death; that he was his neighbor, and that they had visited each other back and forth quite often; that he saw Mr. McCannon frequently during the spring and summer of 1924 prior to his death in October of that year; that in the summer of 1924 he had a conversation with him in which he stated that his wife was in San Antonio; that he seemed troubled about some money owing to him by one of his sons; that he spoke of his daughter, and said he had fixed her up; that he had fixed all of his children up so they could make a good living if they would be industrious; that he had bought his daughter a house and lot in Katy; that he had given her a deed to it, and, after having done so, her husband had said, "We can't eat that, can we?" that Mr. McCannon's conversation with him on the occasion mentioned was conservative, coherent, and rational; that, when talking on a subject, he kept it connected; that he told him during such conversation that he was going to Beaumont that night; that he saw him about a month later, when he came back from Beaumont, and he was then crippled; that he had a conversation with Mr. McCannon after he came from Beaumont; that he saw him every once in a while from that time up to the time of his death; that as a friend he took an interest in him, and had become very much attached to him; that McCannon was a Bible scholar. Continuing, he testified:

"Considering the conversation I had with Mr. McCannon during the month of June, 1924, when he told me about his son, Dan, owing him money, and not keeping the interest paid, and talking about his son-in-law, I would say that at that time his mind was absolutely as sound as it ever was. I saw nothing to call my attention to him as being of unsound mind, or a weakness of his mind in any way. Considering the fact that Mr. McCannon was some 84 or 85 years old, and, considering my observation of other men of that age, I would say that he was more active mentally than most of them. I am satisfied that in June, 1924, Mr. McCannon had sufficient mental capacity to know the nature and extent of his property that he might own, just as much so as when he was making it. I am sure at that time that Mr. McCannon had a mind sufficiently sound at that time to know who his children were and who his grandchildren were, and he even pointed up on the wall to the picture of his children. I did not pay any attention to the picture, but he pointed it out to me. I could not tell you just when he did that, but it was before 1924. I certainly think that in June, 1924, Mr. McCannon had a mind sufficiently sound, and had sufficient mental capacity to enable him to know the different claims or deserts that his children might have on his bounty, because I know he thought they were not treating him just right. When Mr. McCannon came back from Beaumont, I did not see a bit of difference in his mental condition to what it was when I talked to him in June. If you were to ask me all of those questions which you have just asked as to his mental condition after he came back from Beaumont, I would say that his mind up until he commenced to die seemed to be all right. Mr. McCannon commenced to die about a week or 10 days before he actually died. I pronounced him dying about 8 days before he died. I would say that Mr. McCannon was a man of strong will power, a man of determination and action whenever he made up his mind. He might have been a little slow about making up his mind, but, after he made up his mind, he would carry out what he wanted to do.

"I know the proponent of this will, Mrs. Hannah J. McCannon. I have known her for the same length of time that I knew the old gentleman, about 5 years. I have had occasion to see Mrs. McCannon in her home and observe the relationship between her and Mr. McCannon as to whether or not they were getting along all right. They got along just as nicely as husband and wife very well could, that is, apparently to me. I also had occasion to observe the character of treatment she accorded to Mr. McCannon in his last illness, and at other times, for that matter. I know that Mrs. McCannon gave Mr. McCannon extraordinary good treatment. I don't think any nurse could have treated him any better, and no wife could have taken any better care of him than she did."

A. V. Smith testified that he lived just across the alley from D. S. McCannon, and had so lived for 7 or 8 years; that he saw Mr. McCannon frequently; that he often came over to witness' house, some times three or four times a week; that he recalled the occurrence of the death of Mr. McCannon on October 20, 1924; that he talked with the deceased about 3 weeks before he died; that, when Mr. McCannon wanted anything done, he called on witness; that he frequently conversed with the deceased.

Testifying further, he said:

"When I saw Mr. McCannon about 3 weeks before his death, he was lying on a cot, and got up and sat up and talked to me. At that time his mind seemed to be sound; he talked just like he always did. As to whether or not Mr.

McCannon had as good or better mind than the average person, I would say that he was a very brilliant man, far above the average. I say that on account of all his talk and in his memory in regard to things that happened that I knew, that is, information I had from all his talk, and his memory and everything, and the way he attended to his business."

Again:

"Mr. McCannon did make a statement in my presence with reference to his children, and whether or not he loaned them money. Mr. McCannon one time had some business to attend to at Katy, about some land he had there, and a couple of houses. He did not have a car, and he got me to take him up there, and on that trip I think we visited three farms and two houses in Katy. He was making arrangements about his business, and collecting rent, and on that trip he said he had loaned out something like $32,000, and most of it was to his children."

M. S. Taggart testified that he knew D. S. McCannon 6 or 7 years prior to his death; that witness was chairman of the official board of deacons and elders of the Heights Christian Church, in which Mr. McCannon was also an elder, and was later elected an elder for life; that Dr. Olive was also an honorary member; that as a rule during the last 2 or 3 years of his life Mr. McCannon always attended the board meetings, and attended some of the board meetings during the spring and summer of 1924; "during the year 1923 when Mr. McCannon was in town— he went away one summer—I think he attended practically every meeting and I know he attended some of the meetings during the year 1924, but I don't know how many;" that Mr. McCannon was very active in discussions during the meetings; and the witness continued:

"Mr. McCannon generally took a part in any meeting where he was, although I don't remember any particular discussion that I heard him take part in. I have seen him on his feet talking. I am quite sure that Mr. McCannon attended some of those Sunday School classes during the spring of 1924. I had some business transactions with Mr. McCannon in the spring of 1924. We were getting ready to get a new pastor, and we wanted to clean up all of the bills, and we were going to borrow the money from the bank, and they wanted us to pay 10 per cent. interest, and Mr. McCannon said 'I will loan you the money, and you make it out for 10 per cent., and, when it is due I will give the church the 10 per cent., but make it out on the regular form.' The amount we needed that time was $300. It is my opinion that during the time of these transactions that I have testified about Mr. McCannon's mind was sound. I saw and talked to Mr. McCannon after he got sick in July, 1924, preceding his death in October. The first time I went to his house after he came back from Beaumont, when he was sick, was about two or three weeks after he came back. * * * When I went to see Mr. McCannon on that occasion we talked about the church affairs. Mr. Mc-

Cannon was wondering how much he had paid on the lots we bought, and I told him I did not know how much he had paid, and he remarked that he had all of the checks, and that he put on the checks what they were for. He said he would like for somebody to check them up, and I told him I would do that. He said he thought he had paid about $900, and I told him I knew he had paid everything that was due. He did not get the checks, and we did not take it up any more. I remember that, because he was very anxious for us to go on and build that church. It is my opinion that on that occasion when I saw Mr. McCannon, about 2 or 3 weeks after he came back from Beaumont, that his mind was sound. I knew when he was in Beaumont, and I think this was about 2 or 3 weeks after he came back."

Testifying further, the witness said that he never knew any couple to get along nicer than Mr. and Mrs. McCannon did; that Mrs. McCannon was very kind and considerate of Mr. McCannon.

Mrs. Lambert, the preacher's wife, testified that she was certain that Mr. McCannon had a sound mind in August 1924; that in her frequent conversations with him she saw nothing to indicate that anything was wrong with his mind; that the conversations she spoke of occurred after Mr. McCannon came back from Beaumont in July, 1924.

A. B. Jones and W. L. Dyer, bankers, testified that they knew D. S. McCannon for several years prior to his death. Both testified that McCannon had a checking account in their bank; that he was frequently in the bank in the spring and summer of 1924, and drew checks on his account; that, basing their opinion on their knowledge of him, they would say that he had mental capacity to know what property he owned, to know who his children and grandchildren were; that he would make deposits; that at the times they saw him his conversations were rational, coherent, and consecutive.

Mr. Jones testified, from his observation and transactions with Mr. McCannon, he would state that during all the time he knew him he was a man of sound mind; that he had sufficient mental capacity to comprehend and know what property he owned, and to attend to his business, and to know the objects of his bounty and who his heirs were.

In addition to the witnesses above mentioned, there were some twenty or more other neighbors and acquaintances of the deceased who testified that they knew the deceased prior to his death, and that they saw and conversed with him in the summer of 1924, just about the time he executed his will, and that there was nothing wrong with his mind.

The undisputed evidence shows that Mr. McCannon was devoted to his wife, the proponent, who was about 76 years of age at the time the will was executed.

The making of the will was a rational act.

Its provisions, under the circumstances shown to have existed at the time of its execution, are not unreasonable.

The witnesses for contestants who gave their opinion adversely to the mental capacity of Mr. McCannon were Mr. and Mrs. James Tarter, Dewey Peek, Dr. G. H. Reed, Miss Ethel Bolin, and Dr. Wooley. James Tarter and wife lived in Katy, Tex.

James Tarter testified that he knew D. S. McCannon from October, 1913, up to a month before he died; that he lived in a house with him for three years; that then Mr. McCannon moved to Houston; that Mr. McCannon came to his house in April, 1924, and that he went with him up to a house owned by him; that they measured some of the window lights, and Mr. McCannon told him to have the house repaired and fixed up; that Mr. McCannon came back to his house and ate supper; that he saw him no more before his death; that in April, when he came to Katy, deceased did not seem to act as he did when he knew him—he seemed to be worried; that he would start out on a conversation, and then start something else; that, when he saw him at Katy in April, he did not think the old man was right. Continuing, he testified as follows:

"I could not say but what Mr. McCannon talked sensibly to me when he discussed the repair of that house and putting in the new windows. I said that Mr. McCannon seemed worried after he went back to the house to eat supper. Of course, he was a man 84 years old, and he looked old. He came up to Katy on the train on that occasion by himself. He went down to see about the house that day. I did not talk with Mr. McCannon, except a little there at supper time. * * * He conducted himself on that visit just as any other old man would have done; he acted nice, he did not do anything out of the way. The next morning Mr. McCannon went home. He walked from my house down to the train, which was about four blocks."

Mrs. Tarter testified that when she saw the testator in April, 1924, she concluded that his mind was not sound; that his conversations did not run in the manner they did when she had met him prior to that time; that it seemed to her that his mind was wandering; that it was not right some way or other, and he did not carry on a straight conversation and carry out his sentences; that, while at dinner, he would ask for things, and, when they were passed to him, he would say that he did not want them. He would ask for some dish to be passed to him, and, when it was passed, he would say, 'I don't care for it.' She stated that Mr. McCannon employed her husband to repair his house, and told him how to repair it; that for a man of 80 years of age he was remarkably preserved physically; that Mr. McCannon ate supper with them, and he carried on the usual conversation; that he was at that time

perfectly familiar with his property at Katy, and what he owned there; that he was rather particular about taking care of his property, and kept pretty close track of his business affairs.

Dewey Peek testified that he was at Mr. McCannon's house on September 26, 1924, which was 2 months after the will was executed; that at that time Mr. McCannon was not able to execute a contract leasing to him a certain farm; that Mrs. McCannon told him that the doctor said her husband could not live very long; that, when he saw Mr. McCannon on September 26, 1924, he said that, if he was only well, he could take up that big contract to-morrow, and told about being out at some dance with some boys. He stated that he thought that at that time Mr. McCannon was of unsound mind; that he would not say he was crazy, but his mind was wandering.

Being questioned as to an affidavit made by him some time prior to the trial of this cause, the witness testified as follows:

"That is my signature on the paper which is now exhibited to me, I signed and sworn to that paper. That was read over to me before I signed it. What is stated in that paper was the truth. In that paper I state that my name is Dewey Peek. I live at Katy, and I am renting 160 acres of the McCannon land. That I had been acquainted with Mr. McCannon for about two years; and that I called to see Mr. McCannon shortly before he died about renewing the lease. The day I talked to him, while he was talking about renewing my lease, he seemed all right in his mind, and talked intelligently about it. All of that is the truth; it still seems that way to me. That was somewhere in the neighborhood of September 26th. * * * I signed that statement, but I don't know whether I swore to it before a notary public. I did not suppose he was a notary public; I just supposed he was a stenographer. Prior to September, 1924, in my conversation with Mr. McCannon, he always appeared to have a sound mind. I never talked with him much, but I never heard him say anything up to that time which indicated that his mind was not all right."

Dr. Reed testified that he first saw Mr. McCannon on the 16th day of July, 1924, and that he saw him again and for the last time on the 17th day of said month; that he was first called to see Mr. McCannon professionally on the 16th, and found him in such condition that he did not think he would live more than a few weeks, and was surprised to learn that he lived until October 20th; that when he saw testator on the 16th witness was sure there was no lack of consciousness; that he replied to questions, not coherently, but would reply to them and understood them; that on the first day he saw testator he was perfectly conscious and could see witness; that he ordered an alcoholic stimulant for testator; that, when he called the next day, testator did not recognize him,

and seemed to be just like a child; that the old gentleman seemed to have a good sense of humor; that the first day he saw him they were boys together for a while, when they were trying to get that stimulant, and the second time he was there they were very friendly, and Mr. McCannon seemed to recall the fact that the alcoholic stimulant was ordered the day before, but, taking into consideration his observation, of the old man, hearing him talk, and the questions he asked, and the physical examination he made of him, he did not think he was a man of sound mind at that time.

Testifying further, he said that it is unquestionably true that a man's mind would come and go when he was in the condition he found the old man to be; that his ability to know will vary from day to day, but he thought that a man whose mental vigor had become so greatly reduced as that of 'the old man could not recover to such extent as that his actions could be relied on.

The testimony of this witness is, we think, to the effect that from what he saw of Mr. McCannon on the 2 days he administered to him he did not think he was of sound mind, but, as the old man lived much longer, than he thought possible he might have been mistaken as to the possibility of his improvement mentally.

As we think the testimony of the witness Ethel Bolin of but little weight, we will not attempt to set it out.

There are parts of Dr. Wooley's testimony, when taken separately, from which a conclusion might be reached that Mr. McCannon was lacking in testamentary capacity at the time of the execution of his will, but we think, when such testimony is taken as a whole, no such conclusion could be reasonably reached, in the face of the abundant evidence tending to establish the testator's testamentary capacity.

More than twenty men and women, neighbors or intimate acquaintances of the deceased, among them doctors, bankers, etc., testified that D. S. McCannon was, up until a few days before his death, a man of unimpaired intellect and of good business capacity.

If the testimony of the several witnesses testifying in behalf of contestants relative to the testamentary capacity of Mr. McCannon is considered as a whole, and not from isolated extracts taken therefrom, it will, we think, become apparent that the verdict of the jury based thereon, and the judgment rendered in accordance therewith, were so against the great weight and preponderance of the evidence that they should not be permitted to stand.

The trend of appellate courts of our state, as well as those of others, is to hold that the tendency to assail last wills of the aged and enfeebled upon the grounds of mental incapacity, and by frivilous and inconclusive evidence, chiefly of a speculative character, has grown to such an alarming extent in late years that it should be checked. In Safe Deposit & Trust Co. v. Berry, 93 Md. 560, 49 A. 401, it is said:

"It is no uncommon thing to see testamentary dispositions questioned, and it sometimes happens that they are successfully questioned, though there never had been a suspicion of the testator's capacity during his lifetime, nor after his death, until the contents of his will became known, and the expectations of collateral kindred were defeated by its provisions. These kindred frequently think they ought to have been the objects of his bounty, and because he thought differently they conclude he was incapable of intelligently thinking at all. Because what he did does not comport with what they believed he should have done, they assume he was mentally unsound, and forthwith attack his will, though they never doubted his ability to make a will until they discovered that he had made one which ignored or dissatisfied them. It is time that such groundless assaults should cease, and it is the plain duty of the courts to give them no encouragement or countenance."

In Re Randall, 99 Me. 396, 59 A. 552:

"These are the principal grounds upon which the contestants relied to establish unsoundness of mind. Separately, or all together, they are insufficient to show that Randall had not sufficient capacity to make a will. Intellectual feebleness, from age or other causes, or delusions about matters not connected with property or its disposition, may exist, and notwithstanding the person may have a 'sound and disposing mind and memory,' as the law understands that term relative to the making of a will. If the testator possesses so much mind and memory as enables him to transact common and simple kinds of business with that intelligence which belongs to the weakest class of sound minds, and can recall the general nature, condition, and extent of his property, and his relation to those to whom he gives, and also to those from whom he excludes his bounty, it is sufficient. Hall v. Perry, 87 Me. 572, 33 A. 160, 47 Am. St. Rep. 352. * * *

"The conclusion is irresistible that the jury gave too great effect to the peculiarities and eccentricities of Randall, and failed to discriminate between them and the legal significance of the term 'sound and disposing mind and memory.' The finding that Randall was of unsound mind is set aside as against the evidence."

In Salinas v. Garcia (Tex. Civ. App.) 135 S. W. 588, Judge Fly, speaking for the San Antonio Court (writ of error denied), quoting the words of Chancellor Kent, in Vanalst v. Hunter, 5 Johns. Ch. (N. Y.) 148, said:

"The will of such an aged man ought to be regarded with great tenderness."

And quoting further from Sloan v. Maxwell, 3 N. J. Eq. 563, said:

"The power of disposing of property is an inestimable privilege of the old. It frequently commands attention and respect when other

motives have ceased to influence. How often, without it, would the hoary head be neglected, deserted, and despised."

Proceeding further, he said:

"It is indeed a sad commentary upon humanity that when filial love has failed, and gratitude and devotion have passed away, the fear and awe inspired by the power of testamentary disposition of property becomes the 'shadow of a rock in a weary land,' and will insure the greatest respect and most devoted attention. Except in extreme cases of imbecility, the aged and decrepit should not be deprived of this last defense against ingratitude and base neglect."

In Rice v. Rice, 50 Mich. 448, 15 N. W. 545, it is said:

"But no act can well be more simple than the gift of his property by an old man to the members of his immediate family; and it ought not to be considered, by court, or witness or juror, to be an act requiring strong mind or considerable capacity. The power to make such a gift becomes an important protection in that period of life when incapacity to labor and to conduct profitable enterprises has arrived, and it is important to see that it be not taken away by erroneous notions as to what is required for testamentary capacity."

In Re Bartels' Estate (Tex. Civ. App.) 164 S. W. 859, Chief Justice Pleasants, speaking for this court, said:

"It is not improbable that, because of the apparent unfairness in the will in the proportion of the estate bequeathed to Mrs. Milam, the jury concluded that they were authorized to do what they conceived to be justice between the parties. However praiseworthy such motive may have been, the law does not authorize a jury to hold a will invalid merely because it does not appear to be a fair and just distribution of the estate of the testator."

In Kinne v. Kinne, 9 Conn. 102, 21 Am. Dec. 732, the court said that:

"It still remains the duty of the court to * * * take care * * * that a weakened intellect be not mistaken for one that is lost. Our law has kindly allowed our citizens to select the objects of their bounty, among whom to distribute the fruits of their labor, when they can themselves no longer enjoy them. This is an indulgence dictated by benevolence."

In 28 R. C. L. § 44, p. 94, the author said that circumstances showing that a testator, at the time of executing his will, is suffering from acute pain, or is on his deathbed, does not take away his testamentary capacity; and again he says:

"The power of the mind may be weakened and impaired by old age and bodily disease without destroying testamentary capacity, and mere mental weakness, not due to mental disease, but solely to physical infirmity, does not constitute unsoundness, and the courts will scrutinize the efforts of witnesses to infer mental weakness or insanity from mere physical decrepitude."

Many authorities of the trend of those from which we have quoted are cited in brief of appellant and the appendix thereto, but we deem it unnecessary to cite them here.

What we have said disposes of the first three propositions of appellant, and we shall now proceed to a consideration of her other assignments.

[5] Proponent, appellant here, upon the trial offered in evidence three several receipts signed by contestants C. E. McCannon, Robert A. McCannon, and G. T. McCannon, respectively, of date July 29, 1919, July 29, 1919, and July 28, 1919. The receipt signed by C. E. McCannon is as follows:

"Marion, Iowa, July 29, 1919.

"Received of D. S. McCannon, my father, this day three thousand dollars to cancil my note of like amount given to the said D. S. McCannon and the receipt thereof I hereby acknowledge to apply to my share of my fathers estate when settled."

The one signed by Robert A. McCannon was of the same import as the one signed by C. E. McCannon, acknowledging receipt of $3,000, and the one signed by G. T. McCannon acknowledged receipt of $1,320 to be applied on his share of his *father's* estate when settled.

The court refused to permit the introduction of such receipts in evidence, and appellant in separate bills preserved exceptions to such refusals, and now assigns each of such refusals as error, which she presents as her fourth proposition.

We think the receipts were clearly admissible as tending to establish two facts: First, that D. S. McCannon had made large advances out of his estate to his sons, the parties named, to be accounted for as advances in the final settlement of his estate; and, second, that said sons were the owners of considerable property at the time of the execution of the will of their father, and not in needy circumstances. The establishment of such facts tends to show that the act of the testator in bequeathing to his aged widow, to whom he was very devoted, one-half of his estate, of about $25,000, while he bequeathed to his children jointly the other half, was a rational act, and not unreasonable. This evidence was admissible as bearing on the reasonableness of the will, and as a tendency to show the extent to which testator had aided contestants, thus tending to rebut the inference asserted by contestants that an unequal distribution of testator's estate had been made by the will, and that an unjust discrimination had been made thereby in favor of proponent.

We also think, as to appellant's fifth proposition, which complains of the refusal of the court to permit the introduction in evidence of a receipt signed by Grace, a daughter of testator, on the 26th day of April, 1923, by which she acknowledged the receipt

of a total sum of $3,920.17 from her father: This evidence was admissible for the same purposes as were the receipts of the sons above mentioned.

By her sixth proposition appellant complains of the refusal of the court to permit her to introduce in evidence a deed of date March 15, 1915, by D. S. McCannon, deceased, for a recited consideration of $4,852.50, paid and to be paid as follows: $1,308.47 in cash, and one promissory note for the sum of $3,-544.47, executed and delivered by D. E. McCannon to D. S. McCannon, payable $150 on or before May 15, 1915, and $150 on or before the 15th day of May of each year thereafter for 23 years, and $94.03 on or before the 15th day of May of the twenty-fourth year, without interest, which said deed contains the following clause:

"It is further agreed and stipulated that the death of the said D. S. McCannon before the full and complete payment of said note shall nevertheless operate as a payment of the remaining unpaid portion of said note and a release of the vendor's lien herein retained."

We think the court erred in the refusal mentioned. It had been shown that D. S. McCannon died October 20, 1926, approximately 11 years after the execution of the deed and note mentioned. It is shown that appellant offered evidence, which the court refused to admit in evidence, which tended to show that D. E. McCannon was in arrears in the payment of the yearly $150 mentioned as they fell due. It is apparent that more than one-half of the $150 installments were not due at the time of the death of D. S. McCannon. It is also apparent from the terms of the deed that D. S. McCannon intended to permit his son D. E. McCannon to retain the unpaid purchase money either as a gift or an advancement. Under these circumstances, the deed was admissible as tending to show an advancement made to contestant D. E. McCannon, and to rebut, when considered in connection with evidence showing advances made to other contestants, the inference asserted by contestants that that provision of the will giving to the aged widow one-half of the estate of the testator remaining at the time of testator's death was an irrational and unreasonable act, and an unjust discrimination in favor of the widow.

For the reasons given for sustaining appellant's complaints made by her fourth, fifth, and sixth propositions, we sustain her seventh assignment, whereby she complains of the refusal of the court to permit her to show by a canceled check that D. S. McCannon had, on the 19th day of February, 1918, paid to his daughter Cora Belle Coleman $1,160.

We think the evidence sought through the introduction of the answers of C. F. Hoover and W. E. Law, and the memoranda attached to said answers, which were rejected by the court, were of such vague, indefinite and uncertain character, as it relates to any material issue involved, as to render it inadmissible. We therefore overrule appellant's propositions 8, 9, and 10, by which complaint is made of such rejection.

By appellant's propositions 11 and 12, insistence is made that the court erred in refusing to render judgment in favor of appellant for reasonable attorney's fees and costs of suit against the general estate of deceased, in that it was her duty, as the named executrix of the will, to undertake its probate.

The majority of the court think that appellant's complaint should be overruled, as by article 2056, Revised Statutes of 1925, it is provided that the successful party to a suit shall recover of his adversary all costs incurred therein, except where otherwise provided. The writer, however, is inclined to the view that it was the moral obligation of appellant to undertake the probation of the will, and that, as the refusal to probate was alone upon the finding of the jury of a lack of testamentary capacity of the testator, reasonable attorney's fees and costs should have been taxed against the general estate of deceased in favor of appellant.

By article 2066 of the Statutes, it is provided that the court may, for good cause to be stated on the record, adjudge the costs otherwise than as provided in the article above mentioned. I think undoubtedly good cause for adjudging the costs and attorney's fees against the estate existed, and that such judgment should have been rendered.

By reason of the errors pointed out, the majority of the court has reached the conclusion that the judgment should be reversed, and the cause remanded, and it is accordingly ordered.

Reversed and remanded.

GRAVES, J. (dissenting). While a dissent from a judgment of the Court of Civil Appeals reversing the trial court's judgment as being against the weight of the evidence may be futile, since the Supreme Court has no appellate jurisdiction over such determination (Owens v. Tedford, 114 Tex. 390, 269 S. W. 418), the statutory requirement concerning it seems nevertheless unabated (R. S. art. 1852).

Whatever may be the rule in other jurisdictions, in Texas the course of descent and distribution of one's property at his death may not be changed by will, unless he is at the time of making it 21 years old, or has been lawfully married, and is also of sound mind. Revised Statutes, art. 8281.

Sound mind, as used in this statute, means that he must then have had the capacity (1) of understanding the matter of the business he was engaged in, the nature and extent of his property, the persons to whom he meant to bequeath it, as well as those dependent upon his bounty, and the mode of distribution among them; (2) that he must have had memory sufficient to collect in his mind the

elements of the business to be transacted, to hold them long enough to perceive at least their obvious relations to each other, and to be able to form a reasonable judgment as to them. Bell v. Blackwell (Tex. Com. App.) 283 S. W. 765, Morris v. Morris (Tex. Com. App.) 279 S. W. 806, Prather v. McClelland, 76 Tex. 574, 13 S. W. 543.

To me it seems a fiction to assume that the higher courts of the land—through the supposed trend of judicial decision or otherwise —have in fact come to be the special guardian of the rights of the aged and infirm, with particular reference to the preservation of their power of testamentary disposition. No greater duty rests upon them to protect infirm age than robust youth in the enjoyment by each of all its just rights, and discrimination because of infirmity or strength in favor of or against either would be equally indefensible. The public authority, whether exercised from the jury box or the appellate bench, should always be just before it is generous, "rendering unto Cæsar the things which be Cæsar's, and unto God the things which be God's." If, therefore, there be a "tendency of juries to break, and a fondness of courts to sustain, wills," as appellant's brief here intimates, the privilege of throwing off such trappings and of determining this sort of causes, as all others, upon the law and evidence alone, is open to both agencies. Certain it is that no such proneness, if it anywhere exists, should be taken into consideration in determining whether or not this judgment should be upheld.

In will contests, just as in other cases, the jury are the exclusive judges of the credibility of the witnesses and the weight to be given their testimony. Their verdict, therefore, upon a simple question of fact, to be set at naught upon appeal, must be so against the great weight and preponderance of the evidence as a whole—so shocking to the conscience of the appellate tribunal as a misexercise of the plenary prerogative thus vested in the triers of fact—as to be clearly wrong, hence not to be permitted to stand as a reasonably fair deduction, rationally arrived at, from the testimony. Choate v. Railway, 90 Tex. at p. 88, 36 S. W. 247, 37 S. W. 319; Id., 91 Tex. 406, 44 S. W. 69.

No such reaction from a careful study of the statement of facts accompanying this record affects this member of the reviewing court. On the contrary, it seems to him that there was only such conflict in the testimony as to whether or not old Mr. McCannon had testamentary capacity at the time of signing the purported will as came within the jury's exclusive province, and that the evidence was sufficient to have supported a verdict either way.

The weight of the evidence as an entirety does not necessarily dip upon the side of the greater number of witnesses, even though there be a cloud of them, but upon that of those exhibiting the more intimate and competent knowledge of the testator's mental condition at the time involved, and therefore speaking with the greater probative value.

With that consideration in mind, the features standing out from all the evidence here with compelling force, it seems to me, are the indisputable facts: (1) That the witnesses who had been, during the several months immediately preceding the signing of this paper, in the most intimate relations with him, and consequently in best position to express admissible opinions, all testified that the old gentleman was not then of sound mind, as those terms have been defined by our courts in the cases cited, these being Dr. T. C. Wooley, Dr. G. H. Reed, the professional nurse, Miss Ethel Bolin, and Mr. and Mrs. James Tartar; (2) that Mr. McCannon, while visiting at the home of his son, Dan McCannon, in Beaumont, Tex., on July 16, 1924, just 10 days before the date of this proffered will, suffered such a complete collapse or breakdown in both body and mind that his attending physician classed him as an "irretrievable derelict—pardon the expression, his salvage not worth undertaking, either for his sake or the family's, from a medical standpoint"; (3) that on the next day after his return from Beaumont to Houston he was found to be so far gone from the hopelessly progressive senility and senile gangrene that 3 months later caused his death, that, in the judgment of his regular family physician, he was then only about equal in mental capacity to a child of from 6 to 12 years old.

Only a brief résumé of the evidence supporting these findings will be made.

Mr. and Mrs. Tartar had for more than 10 years before his death been intimate friends of old Mr. McCannon, having for about 3 years of that time lived in the same home with, and kept house for, him at the little town of Katy before he moved to Houston. During that 3-year period he fell from a train and suffered a rupture, of which he was never cured; Mrs. Tartar having nursed him following that fall. After he moved to Houston, he would frequently revisit Katy, having left business and property interests there, and never did so without staying at the home of the Tartars on such occasions, eating his meals there, discussing his business with them, and otherwise giving them continuing occasion to observe his conversation, conduct, and general condition. The last of these visits to them occurred in April, 1924, 3 months before the date of this rejected will; what then occurred and the resulting impression made upon the husband and wife being thus in substance testified to by them:

Mr. Tartar:

"He came up there, and I went with him up to his house, and we measured some window lights, and he told me to have the house repaired and fixed up, and he came back to my house, and ate supper there and I took him to the train, and I did not see him any more. * * * I have stated that I observed Mr. McCannon on different occasions. The last time he came to my house he did not seem to be the same way. He did not act the way he did before. It seemed that he was worried. He would start out on a conversation, talking, and it seemed like that he was worried in some way, but I did not ask him what it was. He would start a conversation and talk, and then start something else. When I saw Mr. McCannon up there at Katy on that occasion in April, I don't think the old man was right to my best knowledge; I don't believe the old gentleman was right."

Mrs. Tartar:

"He stayed all night with us on the occasion of that visit, and I heard him talking with my husband there that night. I had occasion to notice Mr. McCannon's conduct and what he did and said. It seemed to me at that time that Mr. McCannon was losing his mind. He acted more like a child that was not real bright. I heard him carrying on a conversation with my husband. * * * The last time I saw Mr. McCannon his conversation did not run in the same manner that it did prior to that time. It seemed like his mind was wandering; it was not right some way or other; and he could not carry on a straight conversation and carry out his sentences. I noticed that that night while he was out at our house. From my observation of Mr. McCannon from the first time I ever saw him (1913) down to the last time I saw him (April, 1924) I would say that his mind was not sound the last time I saw him. * * * On this last visit Mr. McCannon made to Katy he came out there on the train by himself. My husband works there at the depot, and he met Mr. McCannon and brought him up to the house. The train gets out to Katy at 8:45 in the morning, and Mr. McCannon came right on up to my house from the train, and he stayed up there, and we had dinner, and then I went with him to his house, which he has there in Katy. There was no one in the house, and I went over there to the place with him. I did notice something unusual about Mr. McCannon's condition when he was eating dinner there that day; he just didn't seem like he was right. He would ask for things, and I would pass them to him, and he would say that he did not want it. He would ask for some dish to be passed to him, and every time I would pass it to him he would say, 'I don't care for it.' I was with Mr. McCannon all of that afternoon. We did not stay there at the house and talk, but I went with him to see if he could rent his place out. My husband was with us; we were all together. Mr. McCannon wanted his house repaired, and that is when we went up there. * * * Mr McCannon was able to get along by himself, but he seemed like he was weak. Of course, a man as old as Mr. McCannon would not be as vigorous as a younger person."

Dr. Reed, engaged in the general practice of medicine, was the family physician in the home of Dan McCannon at Beaumont, where the latter's father was so stricken. The purport and final meaning of his testimony as a whole is reflected in these quotations from it:

"I saw the late D. S. McCannon * * * July 16th and July 17, 1924. * * * When I went to see Mr. D. S. McCannon, I found the old gentleman in what would be termed a collapse. His extremities were cold; he was not unconscious, but he was complaining bitterly of his feet and body being extremely cold. His pulse was rapid and weak, and he was trembling, hardly a rigor, not like a shaking chill, but a sort of tremble, a condition which is amply described 'collapse.' * * * When I went back to see Mr. McCannon on the second day, his extremities were somewhat warmer, and he was not complaining so bitterly of the cold; he complained more of the pain, a sense of numbness in his limbs, than he did of the cold

itself. As I recall, there was a manifest strength in his heart action; while pitifully weak, was stronger than it was the day before. The appearance of collapse was not near so marked, yet his mind seemed wandering. He did not recall my having seen him the previous day, and we had to go over the history of the occurrences of the previous day. I say he did not recall—he did recall that some one had told him he might have some alcoholic stimulants, and he distinctly referred to that, and said he thought he ought to have been having it, but he insisted that I had not seen him the day before. I was a complete stranger to him. * * * I made a second examination of Mr. McCannon's physical condition on the second day when we went out there.

"I did not make a diagnosis of Mr. McCannon's case; that is, not by specific name of disease. I thought of him as being an old man, worn out, and I did not expect him to survive very many days. Mrs. McCannon called me out to see Mr. D. S. McCannon. I made up my mind as to what had caused the condition that I saw when I examined Mr. McCannon on these two days. In my opinion, old age was the cause of the condition in which I found him. His limbs were cold because of the lowered vitality, which comes to all of us. As the years pass, our vital functions are lessened, circulatory as well as every other function, and that which tax us ever so slightly in early life, or in middle life, to the aged becomes a practical exertion. * * *

"After having found Mr. McCannon in the prostrated condition in which I found him, it is my judgment that his mind would not reach a stage where it would be any better than it was then. I thought he was going to die any moment. I did not think he would live more than a few weeks, and I was surprised to hear that he lived until October. Taking into consideration my observation of Mr. McCannon, hearing him talk, and the questions he asked, and the physical examination I made of him on two different occasions, it is my opinion that he was not of a sound mind when I saw him.

"After I had examined D. S. McCannon, I thought his time was very limited. I would not have been surprised to have found that he was dead on the morning after I visited him the first time, and, after seeing him the next day, I classed him as a derelict, pardon the expression, his salvage was not worth undertaking, either for his sake or the family's, from a medical standpoint. I do not mean to be cold-blooded, but I did not feel like there was a chance for it. I thought his time was due in possibly a few days, or weeks, or not many months. Naturally the life and death forces will hang by a thread for days, weeks, and months. I considered he was a dead man, but he just had not quit breathing. * * *

"I do mean to say that on the first day I saw Mr. McCannon, although he was in the condition I stated, he was conscious. I could not see any special improvement in his mental condition the next day, and I don't know as he was any worse; he was still conscious. * * * He seemed to have no clear conception of what was being done. He was just like a child in a sense that wanted a thing. It was done, and he knew it was done through his consciousness, but he did not take into mental consid-

eration that this had happened to him. * * * I conversed with Mr. McCannon the second day, and he would answer my questions in a measure, wanderingly. * * * The rest of it is nebulous, in the sense that there are no specific details in my mind, except what created the fact that he did not really know what he was doing and what was going on around him. I just classed him as a man who was in his second childhood, in his dotage, and I recalled that his conversation with me would just about bear out that theory. * * * This matter of a man being childish is something that sets in gradually; it does not occur overnight. * * * It is possible that this old man could have in the preceding April gotten on a train by himself and gone to Katy unaccompanied, and go to a man's house and hire a man to go with him and look at a rent house and discuss with him the matter of having the windows fixed. He might have done it the day before. I would hate to risk him, but he might have done it apparently in a satisfactory manner. * * * It would impress me that a man whose mental vigor had become so greatly reduced as that of the patient under discussion could never recover to such an extent that his actions could be relied on."

The nurse referred to, Miss Bolin, and another registered nurse, Miss Fanny McBride, both lived in the Dan McCannon home, both made examinations of, and ministered to, his father after his collapse there, Miss Bolin seeing him every day until he left for Houston. She testified:

"Mr. McCannon must have remained in Beaumont something like 3 or 4 weeks on the trip he made over there in July, 1924, I think it was close to 4 weeks. I had occasion to see Mr. McCannon and talk with him from time to time during the time he was there. I talked to Mr. McCannon about a little of everything. He was there so long, and I used to wait on him quite a bit, when Mrs. McCannon was busy, bringing him drinks and things like that, and I had occasion to talk to him quite a good deal. I had occasion to observe his conduct and what he said and his mannerisms, etc., during that time. Mr. McCannon wrote letters quite often while he was visiting over there. He used to start to write a letter; he would start in the morning right after breakfast, and then write all morning, and every once in a while want Mrs. McCannon and myself, one, to read what he had written so far, because he would forget what he had written, and he would ask us to read it to him so he would know what he had so he could finish his letter, and it would take him nearly all day to write it, and then he would be completely exhausted, and he would go in and go to sleep afterwards. That was before he had the stroke. The letters Mr. McCannon wrote would not be long, but it would take him a long time to write them. From what Mr. McCannon had to say, and from my observations there, and my experience as a nurse, I would say that during the time Mr. McCannon remained in Beaumont he was more of an unsound than a sound mind. He was very, very childish, and forgetful, and after the stroke he seemed more so than before. I do not remember what date it was that Mr. McCannon left there, but I do remember when

he left they took him to the station in a taxi, and Mr. Dan McCannon went with him."

Miss McBride was present when the stroke occurred, helped put the patient to bed, and remained for some hours thereafter in attendance upon him. She testified about his great physical infirmities, and, although apparently not interrogated as to his mental capacity, made this statement concerning the impression she received about him before he was stricken:

"I did not have occasion to talk to Mr. McCannon but very little. I heard what he had to say, and I saw him sitting out there on the front porch, writing letters, and he would forget at times, and he would have to stop and study until he could call back his memory, or some one would have to help him."

Last and well-nigh conclusive of the whole matter was the evidence given by Dr. T. C. Wooley, eminent physician and superintendent of hygiene for the Houston city school system; for the six years immediately preceding his death, not only had he been the regular physician to Mr. McCannon, serving him as such throughout his last illness, but his next door neighbor and intimate friend as well. A few excerpts from his testimony will suffice:

"Mr. McCannon went from my place to Beaumont. * * * When he stayed there at my house, if he wanted to go to the post office and see about his pension, if I suggested that he not go, he did not go, or suggested that go again, he went, and so forth. * * * Mr. MaCannon was perfectly willing to take my suggestions. What I am trying to say is the man was childish to that extent that he took suggestions from me or my wife what to do. I would say that he had the mentality of a child of anywhere from 6 to 10 or 12 years old. * * * I am not sure as to the time I examined Mr. McCannon after he came back from Beaumont. I am not sure whether it was that same day or the next; it was one or the other, and I found those red spots at that time. * * * He was suffering from senile gangrene. When a man begins to suffer from senility, from a doctor's standpoint, is when he commences to be incompetent physically and mentally, and every other way he becomes childish. That is the best way I know to express it; when a man is suffering from senility, he becomes childish. When I saw Mr. McCannon after he came back from Beaumont, I would say that he was childish. * * * I would say that he had the mentality of a child of anywhere from 6 to 10 or 12 years old. In addition to that, he was suffering from this senile gangrene, which resulted in his death. * * * I said Mr. McCannon's case was progressive, which means that it started in and kept on until he died. * * * I don't think there was any interruption in it. Senile gangrene is not a disease of the brain; it is the nerves. * * * My opinion is this: That the old man, when he first began to suffer with senile gangrene, that he did not remember and would not remember what I had told him the day before, and I do not lay that to gangrene; I lay that to the senility."

The testimony of this group of witnesses, looked at as an entirety, as the jury were

privileged to do, was so corroborated and buttressed by coincident and attending circumstances severally mentioned by them in detailing it from the stand as to make its probative force clear and convincing; it would, perhaps, be an impossible task to disassociate and recapitulate them here, and even the attempt to do it is unnecessary, since they run through it all like a silver lining to the darkest cloud.

Neither is it essential, or even appropriate, that invidious comparisons be made between this evidence and that supporting appellant's contention, since the dissent, conceding the latter to have been sufficient to support a verdict, only affirms that such was the plain effect of that here reviewed also.

Still, by way of emphasis of that position, attention may be directed to these differences: (1) None of appellant's witnesses had lived in the same house with old Mr. McCannon up to the time he signed this instrument; (2) none of them as trained nurses had then taken care of him as such; and (3) only one of them, the venerable Dr. Olive, himself 89 years old, had ever been a physician, and he had retired from practice many years before that time—even he gave his opinion only as a layman, deferring to Dr. Wooley as the attending physician; hence (4) there was no medical testimony contrary to that herein quoted from, although Dr. Olive himself stated that the family already "had had five or six physicians" when he saw the old man; (5) many of appellant's witnesses were casual church, bank, or business acquaintances of her husband, who had sustained only occasional and merely public relations with him; (6) the testimony of Mr. Cole, her able and high-class attorney, who drew the proffered will, was greatly weakened by the admitted fact that, when he took the data for the preparation of it in response to her telephone call, "it had been 6 or 8 months, maybe a year," since he had before seen the old man at all. Others of these witnesses were unable to say they had seen Mr. McCannon after his collapse at Beaumont, among them his bankers, Messrs. A. B. Jones and W. L. Dyer.

Surely the testimony herein digested does not reflect "the mere idiosyncrasies or temporary memory lapses to which old people often fall heir," but considering its high source, and that it was received without an imputation of partiality, unfairness, or self-interest on the part of any witness, did it not rather entitle the jury, in the exercise of their peculiar province, to find that the sana mens in sano corpore did not in either particular exist in old Mr. McCannon; that extreme age, worn-out bodily functions, and insidious disease had left nothing to longer support it, and that the fine old man—for 85 years the possessor of more than usual vigor of both mind and body—had at last fallen a victim to senile dementia, and become one of those "whose hands have survived their heads; who still have strength enough to write a name or make a mark, though the capacity of disposing is dead?"

It seems to me that it did; sitting in the quiet of these appellate chambers, far removed from the scene, from contact with the people who participated, and with nothing but the pulseless record of this trial to aid me, I cannot feel myself in equal position with the jury to pass upon this fact issue.

The evidence indisputably shows that the making of old Mr. McCannon's will was no child's play, nor even the *work* of one having only the mentality commensurate with "from 6 to 12 years of age." There were shown to be as many as three different estates involved, those between decedent and his first and second wives and his own individually growing out of property lying in as many different states, eight adult children by his first wife, three grandchildren, and his second wife being left surviving him.

The natural course for the post mortem disposition of one's property has been crystalized by the public policy of the state into our statute of descent and distribution (Revised Statutes of 1925, title 48) so strongly that, however well recognized the concurrently running parallel right of diverting that current by will, the courts will hold that not to have been effected if the testator's language is so vague and uncertain as to obscure his meaning. Dubois v. House (Tex. Civ. App.) 294 S. W. 935, writ of error refused. With even more zealousy will they see that no such diversion is accomplished through the act of one not satisfactorily shown to have been in his senses at the time. Schouler on Wills, par. 139.

This was an orderly trial, with not a suggestion of prejudice or other improper conduct of judge or jury appearing, there being merely two groups of witnesses of unequal numbers holding different opinions concerning the enfeebled old man's mentality, with the jury choosing between them. In the circumstances, I can find no warrant for setting that choice aside.

Neither do I think there was reversible error in the exclusion of the receipts, check, and deed upon which in part the reversal is ordered. The controlling issue in the case was the testamentary capacity, or the lack of it, of the decedent at the very moment of signing this instrument, and therefore the only possible theory, it seems to me, upon which these papers could have been admissible, was to show whether or not he then had such capacity; but they were too far removed in time, condition, circumstances, and relevancy to reasonably have any probative force upon that inquiry. Some of them were then more than 9—none less than 5—years old, all related to isolated and unexplained transactions had at a time when the old man was admittedly sound in both body and mind. The proffered will was neither ambiguous in terms, being rather couched in the clearly flowing language of appellant's counsel, nor did it make any reference to advancements. It was therefore to be *expounded* only, not explained, by the injection of remote and extraneous matters. Brown v. Mitchell, 87 Tex. 140, 26 S. W. 1059.

In conclusion, while I think the evidence also raised the issue of undue influence upon appellant's part, the appellees, in the state of the record on appeal, are neither entitled to nor asking a reversal on that account.

Believing that substantial justice was shown to have been applied in the judgment rendered below, I earnestly protest against its being **reversed.**

On Motion for Rehearing.

LANE, J. [6] Appellant complained on appeal of the refusal of the trial court to render judgment in her favor against the estate of the testator for such reasonable fee as she would be compelled to pay the attorney employed by her in an effort to have the will of D. S. McCannon, deceased, probated, and for all costs incurred by her in such effort, insisting that it was her duty as the named executrix of the will to undertake to have the same probated.

The majority of the court overruled appellant's contention.

Appellant has filed her motion for rehearing, and insists that the court erred in its overruling of her complaint, and again insists that, in the event the probate of the will is finally refused, judgment should be rendered for her for such fee and costs.

Upon consideration of the motion, we have reached the conclusion that we erred in our former ruling, and we now hold that, if it should be found by the trial court that appellant acted in good faith in offering the will for probate, her prayer for attorney's fees and costs should be granted, even though the probate of the will is refused.

Sound reasoning, we think, would dictate that an executor who in good faith has employed counsel in an effort to have the will probated should not be deprived of his right to charge the counsel fees upon the estate. It was the duty of the executor to see that the will was offered for probate. In support of the conclusion now reached by us, we cite the authorities cited by appellant in support of her contention, together with the statements made by her as to the holdings of cases cited, as follows:

40 Cyc. 1362; Henderson v. Simmons, 33 Ala. 291, 70 Am. Dec. 590; Raines v. Raines, 51 Ala. 237; Alexander v. Bates, 127 Ala. 328, 28 So. 415 (will sustained); Gilbert v. Bartlett, 9 Bush. (Ky.) 49; Phillips v. Phillips, 81 Ky. 328; Taylor v. Minor, 90 Ky. 544, 14 S. W. 544 (obiter) Baldwin v. Barber, 148 Ky. 370, 146 S. W. 1124; McMillen v. McElroy, 186 Ky. 644, 217 S. W. 927; Re Hentges, 86 Nebr. 75, 124 N. W. 929, 26 L. R. A. (N. S.) 757; Day v. Day, 3 N. J. Eq. 549 (will denied probate); Boylan v. Meeker, 15 N. J. Eq. 310 (will denied probate); Senter v. Pentheram, 64 Misc. Rep. 294, 118 N. Y. S. 347 (will sustained); Bennet v. Bradford, 1 Cold. (Tenn.) 471 (will sustained); Bowden v. Higgs, 9 Lea (Tenn.) 343 (will defeated); Lassiter v. Travis, 98 Tenn. 331, 39 S. W. 226 (will defeated); Davison v. Sibley, 140 Ga. 707, 79 S. E. 855 (will denied probate).

"We call attention to the case of Lassiter v. Travis, 98 Tenn. 330, 39 S. W. 226, supra, where the court holds that good faith, rather than pecuniary interests, on the part of the acting executor is a controlling question, and further holds that the fact that the executrix was a large beneficiary under the will does not defeat her right to attorneys' fees; the court saying:

"'Being named as executrix in what seemed to be a valid will, it was the legal duty of Mrs. Lassiter to produce the instrument, if in her possession; and, after having done that, there rested upon her the further legal duty of hav-

ing the supposed will probated, or of renouncing the executorship (Pritchard on Wills & Adm'n, Sec. 30); and these duties were in no way affected by the fact that the will benefited her alone, in the sense that it gave her more and her sister less of their mother's estate than they would receive, respectively, in the absence of the will and as heirs at law. Pecuniary interest under a will is no disqualification for the office of executor, nor does it diminish or enlarge the duties of the person nominated to fill the office. * * *'

"In Butler v. Jennings, 8 Rich. Eq. 87, the executor was allowed attorneys' fees where the will was set aside for mental incompetency."

For the reasons stated, the motion of appellant is granted in part so as that our opinion may conform to the conclusions now reached by us. In all other respects the motion is overruled.