## REICHE v. WILLIAMS.

### No. 11450.

Court of Civil Appeals of Texas.
San Antonio.

Oct. 11, 1944.

Rehearing Denied Nov. 15, 1944.

John Dawson, of Sinton, for appellant.
J. L. McNees, of Dallas, for appellee.

NORVELL, Justice.

This is a will contest. The district court jury found that the testatrix, Mrs. Clara Todd, on November 7, 1938 (the date of the will), had the testamentary capacity to execute a will. Her death occurred on July 15, 1943. Edward C. Reiche (a brother of testatrix), contestant below and appellant here, contends that the trial judge erred in the method employed by him in submitting the issue to the jury. Mrs. Lillie Williams (a sister of the testatrix), proponent below and appellee here, suggests in the argument contained in her brief that it appears as a matter of law that the testatrix possessed testamentary capacity at the time of the execution of the will, and consequently the judgment admitting the will to probate was the only judgment which could have been properly rendered upon the evidence. This contention of appellee is sustained. As the question of testamentary capacity is the only one presented by this appeal, our holding necessitates an affirmance of the trial court's judgment. Errors, if any there be, in the method of submission employed are consequently immaterial.

We shall attempt to summarize and discuss the evidence as briefly as is reasonably possible in order to demonstrate the basis of our holding.

Appellant's summary of the proponent's evidence in the court below is substantially correct and is here set forth:

"Both attesting witnesses, tenants of testatrix, testified that she was approximately 78 years of age at the time of executing the will (on November 7, 1938). That they considered she was capable of knowing what her estate consisted of and that she was capable of knowing the objects of her bounty; that she was able to transact her business affairs; that she was considered peculiar, and did unusual things; that she was very stingy and deprived herself of proper food, but was shrewd in money matters.

"The banker of testatrix testified that he knew her at the time she executed the

will; that she did business with him; that she was a little peculiar in some ways; that she knew approximately what her estate consisted of, and was capable of running her business affairs; that he thought she knew the object of her bounty and to whom she wanted to give her money; that he thought she would understand what she was doing if she made a will; that she had come to him for advice and assistance in her business affairs; that she had told him about some gypsies taking some of her money and blessing it, and finding that they left her blank paper.

"A neighbor testified she had known testatrix for many years, and very well. That testatrix looked after her own business affairs; that she believed testatrix knew approximately how much property she owned and who her kin were; and to whom she was going to leave her money and property. That she considered her a very good business woman.

"Another neighbor of testatrix testified that she had known testatrix a long time and that she had never seen anything wrong with her, and that she had managed her own business affairs."

Contestant called three witnesses, Dr. J. A. Orr, Mr. J. A. Shobe and Mrs. Hattie Shobe.

Dr. Orr stated that he was a graduate of the University of Nashville; had practiced medicine in Texas since 1907; had had some experience with disorders of the mind; read medical books as to mental disorders; knew Mrs. Todd, and had treated her as a physician for some four or five years. He was then asked the following question: "In your opinion, was Mrs. Todd, in 1938, of sound or unsound mind?" Over the objection of appellee, the doctor answered, "unsound mind." This completed the direct examination in chief of the witness, the record thereof being set forth in about two and a half pages of the statement of facts.

This examination does not disclose the basis of the opinion stated, nor does it contain any information as to the witness' understanding of the term, "unsound mind".

In order to clear this matter up, the doctor was questioned as follows upon cross-examination:

"Q. What is an insane person under medical standards? A. What do you mean by that?

"Q. Well, you state, she—when a person is insane, what is the line between a person that's insane and one that is not? A. Well, I wouldn't say that there is any dividing line at times.

"Q. No dividing line? In other words, I might be crazy at times? A. Well, you might be.

"Q. Well, I didn't understand it that way; I thought you doctors had some kind of line that, whenever they passed over that, why, you say that they are crazy or insane. A. Well, you might be perfectly normal today, but how about tomorrow or the next day or some time past? That's what I refer to.

"Q. In other words, they might have something wrong with them for a while and get over it? A. That's right.

"Q. And be perfectly normal at other times? A. That's right.

"Q. Of course, you know what the trouble was with her mind? A. Well, there are a good many things that I believe, and at times a person can be violent and what you call insane, and in a short time, why, they might be all right."

Dr. Orr also testified that Mrs. Todd believed that she had communications with her deceased husband. When cross-examined concerning the matter, he said:

"Q. Well, can't a person be kind of insane in some respects and perfectly sane in other respects? A. I still say that nearly everybody is crazy or insane at times.

"Q. Well, suppose a person believes in spirits,—do you think that that would have anything to do with their transaction of business matters? A. Well, when they communicate with the dead and receive answers, I would say that they are crazy all the time.

"Q. But you don't say that people who say that they can do that are not able to transact business matters, do you? A. Well, I don't know about that. I would say that they couldn't intelligently transact business.

"Q. Well, have you ever made a study of that? A. No, sir.

"Q. So that part of what you are testifying to here is just based on your own personal belief? A. That's right."

Further, the doctor testified:

Cross-examination.

"Q. And just because they admit that they believe in those things (spirits), that wouldn't make them insane and incapable of transacting business matters, would it? A. It would be a class of insanity, yes.

"Q. You mean that you just think they would be a little bit mentally unsound? A. Very much unsound. And you think so, too."

Re-direct examination.

"Q. You are not basing your opinion merely on her belief that she could communicate with spirits, are you? A. No, sir.

"Q. You observed her in other matters? A. Yes, sir."

Re-cross examination.

"Q. What were some of the other matters? A. Well, I observed her when she was in bed—I went to see her when she was sick in bed and she would tell me that she didn't want to see me in the house and then she would be sending out for me in less than two hours' time.

"Q. Well, wasn't that during the last year or so of her life? A. Well, I haven't any dates on that, but I have known it for a good while and it went on for a good while.

"Q. Well, now, when you began to go see her and treat her back in 1943, why, she was absent-minded then, wasn't she? A. She was crazy.

"Q. Of course, you went to see her then? A. Yes, I went to see her.

"Q. That was some three or four years after she made her will, wasn't it? A. I had visited her as a doctor over a period of ten years, I guess.

"Q. Do you think there was anything wrong with her ten years ago? A. I do.

"Q. Well, she transacted business affairs, didn't she? A. I don't know anything about that.

"Q. You don't know whether she could transact business or not, do you? A. I don't know anything about that.

"Q. She might have been sound in business matters? A. She might have been."

The witness J. H. Shobe testified that he had been a partner of Mrs. Todd's husband, who died in 1937; that after Mr. Todd's death, Mrs. Todd came to him for advice; that "she used to speak of them (spirits) a good deal, about the spirit stopping her on the street and about Mr. Todd coming in over the transom and standing by the bed talking with her, you know; and she spoke of that quite a few times." The witness further testified that from his observation of Mrs. Todd, she was of unsound mind in 1938—"she didn't live in this world after Mr. Todd's death. She worried a great deal." However, on cross-examination Shobe testified as follows:

"Q. Well, when she would get your advice, would she follow your advice? A. Yes, sir.

"Q. And didn't she look after the collection of her rents? A. Yes, sir.

"Q. And she knew what property she owned? A. Oh, yes, she knew that.

"Q. And she kept up with her own bank account, didn't she? A. I presume she did.

"Q. And she had stocks and bonds, and she would collect the interest on them, wouldn't she? A. Yes, sir.

"Q. And she knew who was kin to her. Did she know her kinsfolk? A. Oh, yes, she knew her brother-in-law and her sister.

"Q. Do you think she knew Edward Reiche (the contestant), her brother in California? A. I don't know anything about that, but presume she did." (Mrs. Todd's will provided, "that the sum of five dollars ($5.00) * * * shall be paid to my brother, Edward C. Reiche, now residing at No. 437 West 82nd St. in Los Angeles, Calif.")

Mrs. Hattie Shobe testified that she lived with Mrs. Todd from February to May of 1942. That she left Mrs. Todd because "she (Mrs. Todd) kept me awake so much at nights that I just couldn't get any rest and she was very nervous, * * she was always saying that somebody was breaking into the house and that Mr. Todd was talking to her, * * * she said he (Mr. Todd) always came to her over the transom and told her not to drink coffee or to chew tobacco, or something like that. * * * She would cry at nights when she got scared, you know, * * * I would call her of unsound mind. She was not capable of taking care of herself or anything else."

On cross-examination Mrs. Shobe testified as follows:

"Q. She (Mrs. Todd) collected her rents from various tenants, did she not? A. Well, as far as I know, she did, I never did fool with that.

"Q. You know that she transacted her own business, didn't she? A. I don't know.

"Q. Well, you know that she collected her rents from Mr. Duphorne and Mr. Hoffman, didn't she? A. I don't know whether she did or didn't.

"Q. The only business transaction that you had with her was to advise her about this Baby Bond, was it not? A. Generally speaking, I take care of her and advised her.

"Q. And she followed your advice, did she not? A. Yes, sir.

"Q. Well, don't you think she used pretty good judgment in taking your advice? A. Yes, sir.

"Q. Haven't you ever heard of a religious sect that claims they can communicate with the spirits of people that have passed away? A. Yes, sir.

"Q. Did you ever go to a spiritualist church? A. No, sir.

"Q. Well, do you think that people that go to that kind of church—do you think that they are unbalanced because they think that they can communicate with the dead? A. I certainly do think that they are cracked."

■ As a general rule, the terms "a person of unsound mind" and "an insane person" are regarded as synonymous. However, as pointed out in McCannon v. McCannon, Tex.Civ.App., 2 S.W.2d 942, 944: "It must be kept in mind that the issue (in the case of a will contest) is, not whether the testator was, at the time of executing the will, of 'sound mind,' as that term is generally understood in its broadest sense, but whether or not he was capable at such time of understanding that he was making his will, the nature and extent of his property, the objects of his bounty, and the disposition he was making of his property."

■ Although under certain conditions nonexpert opinions as to the sanity or insanity of an individual are admissible in evidence, "a nonexpert witness may not testify as to the sanity or insanity of a person unless he accompanies his opinion with a recital of the facts upon which it is based. The reason for this is that, if the act, conduct or conversation detailed is of a trivial character, it will serve to characterize the opinion given by the witness. If, on the other hand, the circumstance is of an unusual, eccentric or extraordinary character, the witness' opinion may be of great value to the jury in passing upon the issue." 24 Tex.Jur. 430, § 45. In other words, the opinion is no stronger than the facts or circumstances which support it. The statement of the opinion simply rounds out and completes an inference drawn from a certain set of facts. If a factual basis be missing, the opinion is worthless as evidence.

■■ As to expert witnesses, it is stated in Texas Jurisprudence that: "Such a witness may state his conclusions based on a hypothetical state of facts, or the evidence that has been adduced in the case; and if an expert has observed the person whose condition is under investigation—as in the case of the family physician who has been called as a witness to describe his patient's mental state—he may abandon the rule of expert and express his opinion in the same way as may a nonexpert witness." 24 Tex.Jur. 421, § 39. The latter method was employed in this case, and the rule as to the recital of facts upon which the opinion is based applies to Dr. Orr's testimony.

■ From a careful reading of this testimony, we are at a loss to state with any accuracy just what is the doctor's understanding of the meaning of the term "unsound mind." It seems safe to say that in his opinion no sane person would entertain a belief of communication between the living and the dead. However, in Bagwell v. Shanks, Tex.Civ.App., 260 S. W. 222, it was directly held that a woman who was the victim of a delusion in believing that she was in communication with and was guided and controlled by "spirits," was nevertheless competent to make a will, unless the delusion influenced her to make a disposition of her property different from that she otherwise would have made. Here appellant admits that any delusion Mrs. Todd may have had as to her communication with "spirits" did not affect or influence the disposition of her property which she attempted to make by will.

While Mrs. Shobe testified that she had known Mrs. Todd for a number of years prior to the latter's death, her testimony primarily relates to the rather intimate relationship she had with the testatrix during the early part of 1942, over three years after the execution of the will.

There is no evidence that Mrs. Todd in 1938, prior thereto or thereafter, was suffering from a mental disease known and classified as such by the medical profession. The testimony of Mrs. Shobe and also the major part of Dr. Orr's testimony relates to a period of time which must be considered as remote from the date of the execution of the will, McIntosh v. Moore, 22 Tex.Civ.App. 22, 53 S.W. 611, 612, when we consider the age of the testatrix and the known infirmities consequent to old age.

In contrast to the remoteness of the evidence of appellant, appellee's testimony is directly applicable to the time of the execution of the will. The testimony of both attesting witnesses, as well as that of Mrs. Todd's banker, strongly supports the conclusion that Mrs. Todd, despite certain peculiarities, did possess the mental strength and capacity to make a valid will.

It should also be pointed out that, as suggested by Dr. Orr's testimony, a person may be sane at times and insane at other times. This condition has been recognized and discussed in a number of reported cases. In discussing this situation in McCannon v. McCannon, Tex.Civ.App., 2 S.W.2d 942, 944, the Court quoted with approval the following from Von De Veld v. Judy, 143 Mo. 348, 44 S.W. 1117:

"The strongest and best proof that can arise as to a lucid interval is that which arises from the act itself of making the will. That I look upon as the thing to be first examined, and if it can be proved and established that it is a rational act, rationally done, the whole case is proved. What can you do more to establish the act? * * * Here is a rational act, rationally done. In my apprehension, where you are able completely to establish that, the law does not require you to go further."

We think that under the evidence Mrs. Todd's making of the will must be considered as a rational act, rationally done. When the evidence is analyzed, in accordance with applicable rules of law as stated in the authorities above cited, reasonable minds can not differ from the conclusion that on November 7, 1938, Mrs. Todd possessed the testamentary capacity to make a valid will. A person can not by mere inference be deprived of his legal right to dispose of property as he sees fit. McIntosh v. Moore, 22 Tex.Civ.App. 22, 53 S.W. 611; Salinas v. Garcia, Tex.Civ. App., 135 S.W. 588.

The trial court rendered the only judgment that could have been properly rendered on the record, and said judgment is accordingly affirmed.