John W. LEE, Jr., Individually and as Independent Executor of Estate of John W. Lee, Sr., Deceased et al., Appellants,

v.

Lon LEE et al., Appellees.

No. 16802.

Court of Civil Appeals of Texas.

Fort Worth.

March 24, 1967.

Rehearing Denied April 21, 1967.

Fillmore & Fillmore, and H. W. Fillmore, Wichita Falls, for appellants.

Paul Donald and Marvin F. London, Bowie, Ernest May, Fort Worth, for appellees.

OPINION

LANGDON, Justice.

This is a will contest. The testator, John W. Lee, Sr., died May 22, 1964, at the age of 90 years. His wife, Emma Lee, predeceased him, dying intestate in 1946. The contestants (appellees here) are Lon Lee and Gladys Barbee, joined by her husband, Winifred Barbee. Lon Lee and Gladys Barbee, children of the testator, each received a specific bequest of $10.00 under the terms of the will.

The proponents (appellants herein) are John W. Lee, Jr., Individually and as Independent Executor of the Estate of J. W. Lee, Sr. and Winifred C. Lee, Ethel Lee Lambert, a feme sole, Roy Lee and Kenneth Lee, the remaining children of testator who were residuary beneficiaries under the will.

The will was a self-proving will. It was duly probated in the County Court of Montague County, Texas, in Cause No. 5467 on June 22, 1964. The executor qualified on that same date.

Thereafter, on June 29, 1964, contest was filed by appellees in said County Court on the ground that the testator (a) lacked testamentary capacity; and (b) was unduly influenced. After trial to the County Court without the intervention of a jury, the County Court refused to set aside its former order probating the will.

On appeal to the District Court the trial was to a jury on the sole issue of testamentary capacity. The jury found that the testator "was of unsound mind." The trial court overruled appellants' motion for judgment notwithstanding the verdict which was predicated on: no evidence, in-

sufficient evidence and as being so against the overwhelming weight and preponderance of the testimony as to be manifestly wrong.

Judgment was entered on the verdict on June 17, 1966. Motion for new trial filed by proponents based upon the same grounds was overruled. The appellants' three points of error are consistent with the grounds above stated. We reverse and render.

For many years the testator, John W. Lee, Sr., owned and operated a store in Spanish Fort. He disposed of it and opened a grocery store in Nocona, Montague County, Texas, which he operated for a number of years before he sold it to his son, Winifred Lee, in 1956. After this date he continued to come to the store and sit around the office and visit with his friends until shortly before he died. Gladys Barbee, a daughter and one of the contestants, had lived in testator's house caring for him and working in his store, both before and after her marriage particularly the period 1958–1959 until she and her husband were injured in an automobile collision in July, 1961. Thereafter, for a short time, testator lived with his daughter Mrs. Lambert and, after leaving Mrs. Lambert's house, lived the rest of his life in the home of his son Winifred.

Several days before October 2, 1961, the date of the execution of the will, Mr. John W. Lee, Sr., entered the office of Mr. Earl Fitts, attorney in Nocona, Texas. Mr. Fitts, lifelong resident of Montague County, and member of that county's bar since 1933 had known Mr. Lee for a period of 15 years or perhaps longer, and had done legal work for him in the past including income tax reports, preparation of deeds and collection of accounts. At the time of his visit Mr. Lee requested Mr. Fitts to draw a will for him. He explained how he wanted it drawn and what he wanted to do with his property. He discussed the nature and extent of his property and who he wanted to receive it. He named his children and requested Mr. Fitts to put

them in his will as the beneficiaries. Fitts made notes as he talked with Mr. Lee. He prepared the will according to the information he obtained and, "like Mr. Lee told me he wanted it prepared." At the time Mr. Lee discussed the preparation of the will and again on the occasion he signed it he understood the nature of the transaction in which he was involved. He knew what he was doing, that he was making a will.

At the time Mr. Lee came to the office to discuss preparation of the will and when he reappeared to sign it he walked into the office alone and unassisted on each occasion. No one accompanied him either to or from the office on either occasion. No one drove him to the office or waited outside for him.

On October 2, 1961 when Mr. Lee returned to the office Mr. Fitts had completed preparation of the will in line with Mr. Lee's previous instructions. The will was handed to Mr. Lee and he read it. Mr. Fitts explained to him that it would be necessary to have two witnesses and a notary public in order to make it a self proved will. Mr. Lee then said, "Well, you could be a witness, can't you?" Mr. Fitts said he could. Mr. J. P. Janeway, a native of Montague County, a resident of Nocona since 1922, an employee of the postoffice, and a person who had been acquainted with Mr. Lee since 1915, was observed standing across the street. He was summoned to the office by Mr. Lee and Fitts. Janeway, at the request of Mr. Lee, agreed to act as a witness.

Mr. Clifton C. Willard, an insurance man with offices nearby, who had resided about 15 years in a residence just south of Nocona and had been acquainted with Mr. Lee for at least 10 or 15 years, was called in by Mr. Fitts to serve as notary public.

It is undisputed that Mr. Lee signed the will in two places in the presence of the two witnesses, Fitts and Janeway, and the notary public and that the two witnesses signed the will at the request of

and in the presence of Mr. Lee and of one another and the notary public. All signatures were duly subscribed and acknowledged before the notary public whose signature and seal were affixed.

There is no question under this record but that the will was prepared by Fitts at the sole request of Mr. Lee and in exact accordance with the latter's instructions, and that it complied with all of the requisites of a self proved will.

The will contained the names of all of the testator's children and the second page, beginning with Paragraph VII thereof reads as follows: "After expressing my love and affection for all of my children, my other relatives and friends, I still desire to demise my property and my estate as set out above.

"THIS I MAKE AND PUBLISH as my last will and testament, hereby signing and subscribing my name this the 2nd day of October A. D. 1961. /s/ John W. Lee Sr Testator."

"THE STATE OF TEXAS
COUNTY OF MONTAGUE

"Before me, the undersigned authority, on this day personally appeared John W. Lee Sr., and Earl C. Fitts and J. P. Janeway known to me to be the testator and witnesses respectively, whose names are subscribed to the annexed or foregoing instrument in their respective capacities, and, all of said persons being by me duly sworn, the said John W. Lee Sr, the testator, declared to me and to the said witnesses in my presence, that said instrument is his last will and testament, and that he had willingly made and executed it as his free act and deed for the purposes therein expressed; and the said witnesses, each on his oath stated to me, in the presence and hearing of said testator that said testator had declared to them that said instrument is his last will and testament, and that he executed the same as such and wanted each of them to sign it as a witness; And upon their oaths each witness stated further that

they did sign the same as witnesses in the presence of said testator and at his request; And said testator was at such time more than twenty one (21) years of age and is of sound mind; And that each of the witnesses is now at least fourteen years of age. /s/ John W. Lee Sr Testator /s/ Earl C Fitts /s/ J. P. Janeway Witnesses.

"Subscribed and acknowledged before me by the said John W. Lee Sr, testator, and subscribed and sworn to before me, by the said Earl C. Fitts and J. P. Janeway witnesses, this the 2nd day of October A. D. 1961. /s/ C. C. Willard Notary Public, Montague County, Texas."

"In order to secure probate of a will, the applicant must prove to the satisfaction of the court that the testator at the time of executing his will was of sound mind; competency will not be presumed. But where a prima facie case for probate of the instrument has been established, the contestant must prove his allegations of incompetency by a preponderance of the evidence.

"In an original suit to set aside a probated will on account of the maker's lack of testamentary capacity, the burden rests on the plaintiff to establish the fact of incapacity. Inasmuch as it has been admitted to probate, the instrument in general will be presumed valid, and the contestant is under an obligation to introduce evidence sufficient to overcome this presumption.

"Where a will is self-proved in accordance with the applicable provisions of the code, testimony showing that the testator was of sound mind at the time the will was executed is not required of the proponent; the contestant must prove testamentary incapacity." 61 Tex.Jur.2d 120, § 21, and authorities cited.

"The party having the burden of proving testamentary capacity or incapacity must establish the fact by a preponderance of the evidence. The right of a person to dispose of his property by will in what-

ever manner he sees fit is valuable, and probate will not be denied on the basis of evidence that creates only a suspicion or a surmise of mental incapacity; the evidence presented must be of material and substantial value.

"Testamentary capacity or incapacity may be proved by evidence of circumstances from which it may reasonably be inferred, but the circumstances relied on must be of a satisfactory and convincing character." 61 Tex.Jur.2d 132, § 27.

In our opinion the evidence relied upon by the contestants, appellees herein, was not satisfactory and certainly not convincing in character. At most it could only create suspicion or surmise of incapacity at intermittent periods not associated with the period of time during which the testator executed his will.

"The issue of testamentary competency must be determined on the basis of the testator's condition when the instrument in question was executed; that is, when it was signed and attested to. * * *" 61 Tex. Jur. 123 § 23.

■ "The state of mind of a testator at the time of the execution of the will must be made the test of sanity, and the state of mind at other times can have no probative force, except as it may tend to show the state of mind of the testator at the time of execution of the will." Navarro v. Garcia, 172 S.W. 723 (San Antonio Civ.App., 1915, no writ hist.)

On the trial of the case the two witnesses to the will, Fitts and Janeway, and the Notary Public, Willard, were called and each testified as to facts above related with reference to the execution of the will. Janeway and Willard, who had known Mr. Lee for many years and had visited with him around town frequently in the year or so immediately preceding his signing of the will, stated that in their opinion he was of sound mind on the occasion they witnessed him sign his will. Mr. Willard added that, "I didn't think anything else but he was sound." Mr. Janeway discussed with Mr. Lee the purpose of his signature. In his frequent prior conversation with him Mr. Lee was at all times coherent. He had no hallucinations and did not talk about unreal things. He would "kid" and "tease" people. Mr. Fitts testified that in his opinion Mr. Lee was of sound mind at the time he came to his office and told him how he wanted his will drawn and on the occasion he returned and signed it. The testimony of these witnesses was unshaken. There is no other testimony in the record as to the testamentary capacity of Mr. Lee as of the date he first contacted Mr. Fitts and on the occasion several days later, October 2, 1961, when he returned and signed it in the presence of persons who had known him over a long period of years.

"The terms and provisions of a propounded instrument are admissible and of significant probative force on the issue of testamentary capacity." 61 Tex.Jur.2d 137 § 31; and p. 121 § 22 and authorities cited. The will in question named all of testator's children and with clarity designated the proportion of his property he desired each to have. See Bell v. Bell, 237 S.W.2d 688 (Amarillo Civ.App., 1951, no writ); Jowers v. Smith, 237 S.W.2d 805 (Amarillo Civ.App., 1950, no writ); Steinkamp v. Erwin, 249 S.W.2d 1012 (Galveston Civ.App., 1952, no writ).

The record reflects that the testator executed a power of attorney on February 16, 1960 at the office of Mr. Glenn Wilson, an attorney who had practiced in Nocona since 1937. He was acquainted with the testator and each of his children, all of whom appeared in his office, together with Waunzita Simpson, testator's granddaughter (named as attorney in fact) when the instrument was drawn up and signed by all of them. By this instrument Waunzita Simpson and the testator were to jointly sign all checks. Mr. Wilson testified that the testator climbed 24 steps and walked unassisted into his office on that date. The instrument was prepared to relieve the testator of business responsi-

bility because he was advanced in years, not too well, and was forgetful. The grand-daughter was empowered to handle the business along with the testator. This record contains no hint of incapacity on the part of the testator during the period immediately prior to, the date thereof, or the period immediately subsequent to the execution of this instrument.

Dr. J. W. Major, M.D., who has his own clinic and hospital in Nocona, Texas, testified in essence as follows: he had been consulted by the testator over a period of 9 years from 1955 until his death on May 22, 1964. He first treated the testator in 1955 for a broken arm. He treated him for the usual colds and gave him flu shots along. He saw him in October of 1959 and again two years later on October 30, 1961 for a bad cold. On the latter date he also treated him for arteriosclerosis, commonly known as hardening of the arteries. He was complaining of dizziness caused from a retarded flow of blood to the brain and which results in slowing down but not stopping a person's ability to organize his thoughts. It affects memory for recent events while memory for distant events may be very clear. The disease is a very slow process which gradually increases in severity. It is difficult to draw a line as to when it begins to interfere with reason but it is not for a good while. The disease is classified with respect to its severity as follows: (1) It can be diagnosed for what it is; (2) it is beginning to bother the patient; (3) it is producing some definite symptoms; and (4) it is becoming disabling.

Dr. Major, as of October 30, 1961, placed the testator under the third classification because he complained of dizziness (a symptom of the disease) at that time. There is no evidence of other symptoms or that it had become disabling as of that time. Nor was there any evidence that his condition affected his capacity to make and execute his will.

Associated with his vertigo and dizziness, the testator may have had a very minimal or mild degree of senile psychosis which is due to old age, arteriosclerosis or a combination of the two. In its milder form it is intermittent. At times a person with this disease is perfectly rational and at other times they have spells of confusion. Some suffer from hallucinations and others do not. The senile psychosis did not affect Dr. Major's treatment of the testator until sometime in 1963. Prior to then Dr. Major was of the opinion that over the major portion of the time about then (October 2, 1961 when he signed the will), the testator "was probably clear more of the time than he was not, and could probably run his business pretty well. That was my feeling." The doctor also stated affirmatively, that in all likelihood, the testator understood the business in which he was engaged on October 2, 1961 while he was making his will and that he was able to know what he owned and to gather his thoughts.

Four additional witnesses called by the proponents of the will testified essentially as follows:

Verna Harvey, licensed vocational nurse (LVN). She had known the testator for 20 years. From the time he had the store in Nocona until 1962 she spoke to and had brief conversations with the testator almost every day while "trading". This continued after he sold the store. He always spoke to and talked with her when he was in the store about the weather and different things, including people he knew and about her family. "He seemed like of sound mind," to her.

Terrell Thomas Benton, age 83, of Nocona had known the testator from the time he opened the store in Nocona until he died. He put the "bottom" (floor) in the store when testator moved into it. The witness traded at the store. He saw the testator two or three times a week and often sat in the back of the store and talked with him for an hour or so. He was always able to talk and understand what was said to him. He described the testator as "just a dang good man", jovial and, "it seemed to me like

he had as much sense as anybody." He saw the testator until less than a year before his death.

George Pults, age 71, had known the testator since he opened his store in Nocona and had seen him year in and year out about three or four times a week or more, from that time through 1962. When asked if the testator was, in his opinion, of sound mind, the witness stated, "Well, I couldn't tell any difference in him." Mr. Pults generally came in the back door and testator would usually be sitting back there at the desk and ask him how he was getting along and about the crops and stock. They discussed farming and stock in particular. Testator knew how many cattle he had and their condition. He had no difficulty in keeping on a subject. He never indulged in any fantasies.

Waunzita Simpson, granddaughter of the testator, testified that she was given the power of attorney in order that she could assist her grandfather in handling incoming rents and bills and in writing checks. Prior to this arrangement she stated that Lon Lee had written checks on the testator's account and that the Barbees and Lon Lee had been collecting debts and rents off the testator's property. She was of the opinion that her grandfather would have had the capacity to know and understand when unauthorized checks were given on his account and the capacity to tell the bank he did not want such checks paid. This witness assisted the testator in the management of his business with the approval of the entire family from February 16, 1960 until he died. In this connection she was around her grandfather; all the time and in her opinion he, "definitely was a person of sound mind."

Mr. Lawrence Pemberton, who came to Montague county in 1893, had known and frequently seen the testator for many years, and thought he was a person of sound mind.

The contestants relied upon the testimony of seven witnesses, including C. R. (Charlie) Lee, age 78, a brother of the testator and Charlie W. Lee, grandson (son of Lon Lee) of the testator. These witnesses for the most part were of the opinion that the testator was of unsound mind. One of them qualified her answer by stating, "Well, I don't believe that he was able to really know what he was doing all the time." This witness looked after the testator almost daily for a period of time as a "baby sitter" until sometime in July of 1961. She stated that most of the time testator knew people who came to see him. He day-dreamed a lot and talked about old times, about wagons and that sort of thing. She could not recall him talking about unreal things or fantasies. Another of them stated, "I am going to say he was of unsound mind, because his mind—well, he didn't have the mind that he should have had. I know that." He also stated that he would be safe in saying that the witness did not know him the last year of his life. Another of the witnesses stated that the testator told him, "This world is getting in such a mess that you can't tell when a man is going to shoot you." (We do not consider this a delusionary statement.) That on at least two occasions during gin season in 1959 the testator would drive to the gin in his car and start walking back without it. Another of the witnesses who "thought it (the estate) was getting in the wrong hands," stated that on the occasion the testator was honored at Spanish Fort he might at times have acted like a person of sound mind but at times he thought not. This witness had no idea as to how many times or when he saw the testator in 1960 or 1961 and was unable or else unwilling to state when he last saw him before October 2, 1961 or thereafter.

The testimony of the witnesses for the contestants additional to that above set out was summarized by the attorney for the contestants in his hypothetical question to Dr. Major as follows: "Now, if a patient has been seen sitting on a tank bank with a gun, (we find no reference to a gun in the record) and has been known to have told

people that he was sitting there to watch for a headless woman, and has been known to tell people that a man was going to kill a woman and throw her in the tank, and a man who has been known to have been looking for a woman named Mary Johnson, who died many many years, 50 or 60 years before the time that he was inquiring about her, a man who could not recognize his children, could not recognize a nurse or an attendant who saw him each day and sat with him each afternoon, and once was told who she was and was unable to retain the name for very long periods, a man who saw television programs and imagined them to be real, and told people that they occurred on the streets of Nocona, that he saw Tom Lindsey, the Sheriff, hanging a man on the streets of Nocona, a man who could not remember whether he had eaten or not, and would argue that he had when he hadn't, and when he hadn't, he would argue that he had, a man who would forget where his car was and walk off without it, a man who would wander out into the streets and had to be watched and brought back in from off a busy street; if a man had all those symptoms, would you say that he is suffering from senile psychosis?"

To this question the Doctor answered "yes." He then stated that the severity would depend on how often and how persistent he was in his delusions. He also stated that frequent napping or drowsiness was not specifically a symptom of either senile psychosis or hardening of the arteries.

The witnesses called by the contestants, like those of the proponents, had known the testator over a long period of years. Their testimony described a man approaching his 90th birthday, with the attendant loss of memory, waning health and the other problems of old age which require care and assistance on the part of others. Not one of these witnesses offered any testimony upon which an opinion could be based concerning the capacity of the testator as of the day and time he contacted his attorney or as to the date and time he executed his will.

The record contains only a few dates by which the testimony of witnesses may be dated. These dates are 1956, when testator sold his store; February 16, 1960, date of the power of attorney; July 1961, date of Barbee accident; October 2, 1961, date of the will and May 22, 1964, date of testator's death. Much of the testimony relied upon by the contestants related to instances which occurred prior to 1958 and up to the year 1960, yet not a single person has raised any question as to the capacity of the testator to execute the power of attorney on February 16, 1960, nor as to the manner in which he handled his business with his granddaughter thereafter when his acquiescence was required in the issuance of all checks. Still more of the testimony of the contestants related to instances occurring about the time of and on the occasion of testator's 90th birthday and instances which occurred during the last months of his life.

It was difficult for any of these witnesses to date any of the occurrences about which they testified and a great deal of their testimony was based upon hearsay, particularly the events involving the headless lady and her identity. Hearsay has no probative value when offered to prove the facts asserted by the various witnesses and upon which their opinions were based.

The evidence described the testator as one who was generally able to attend to his business although he was in bad health, forgetful, occasionally made mistakes, had misgivings about his business ability and was at times confused or subject to delusions of short duration.

There is no evidence in this record of probative value which with the inferences that may be drawn therefrom will support a finding that the testator was laboring under a delusion which affected the terms of his will. Lindley v. Lindley, 384 S.W. 2d 676 (Tex.Sup., 1964). Such delusions as the testator may have sustained from time to time were short lived and did not influence him to make a disposition of his

property different from that which he otherwise would have made. There was no testimony indicating that the testator was influenced by delusions in making the will he did. The mere fact that he may have temporarily entertained such delusions in the past would not affect the validity of the will.

In Safe-Deposit & Trust Co. of Baltimore v. Berry, 93 Md. 560, 49 A. 401, 408 (Maryland, Ct. of App., 1901) it is said: "There must be a basis shown for the formation of a rational conclusion which is not a mere conjecture, but is knowledge. Hence, if that basis is trivial or insufficient, or does not furnish, in the judgment of the court, an adequate ground to support such a conclusion as amounts to knowledge, the witness should not be permitted to express any conclusion at all. Facts must be stated so that it may be seen whether the conclusion deduced from them by the witness has any relation to, or can be fairly said to be dependent on, them."

To the same effect see Reiche v. Williams, 183 S.W.2d 587 (San Antonio Civ.App., 1944) in which the court speaking through Judge Norvell stated:

"Although under certain conditions non-expert opinions as to the sanity or insanity of an individual are admissible in evidence, 'a nonexpert witness may not testify as to the sanity or insanity of a person unless he accompanies his opinion with a recital of the facts upon which it is based. The reason for this is that, if the act, conduct or conversation detailed is of a trivial character, it will serve to characterize the opinion given by the witness. If, on the other hand, the circumstance is of an unusual, eccentric or extraordinary character, the witness' opinion may be of great value to the jury in passing upon the issue.' 24 Tex.Jur. 430, § 45. In other words, the opinion is no stronger than the facts or circumstances which support it. The statement of the opinion simply rounds out and completes an inference drawn from a certain set of facts. If a factual basis

be missing, the opinion is worthless as evidence."

In the Reiche case the court commented on the remoteness of the evidence of appellant as contrasted to the testimony of the appellees which was directly applicable to the time of the execution of the will. The same situation prevails in the case at bar in which the two witnesses and the notary public, who were present when the will was executed, testified as to the capacity of the testator as of that time and were the only witnesses who did so. In Von De Veld v. Judy, 143 Mo. 348, 44 S.W. 1117, it is stated that: " 'The strongest and best proof that can arise as to a lucid interval is that which arises from the act itself of making the will. * * *' " The Supreme Court in Reiche v. Williams, 143 Tex. 365, 185 S.W.2d 420 (1945), disagreed that the will in that case was established as a matter of law. It did not otherwise overrule the language above quoted from the opinion of the Court of Civil Appeals.

"Laymen, as well as expert witnesses, may give their opinion as to the soundness of mind of a testator. This testimony must be preceded, however, by evidence showing adequate knowledge and observation of the decedent by the witness, and opinions based on hearsay are inadmissible.

"The opinion of a witness, expert or non-expert, must be limited to the issue of whether the mental state of the decedent was such that he was able to appreciate the consequences of the testamentary act, since his competency or capacity in general is a legal conclusion to be determined by the trier of facts.

"A nonexpert witness must give in detail the relevant facts on which his opinion is based, if he has testified that the testator was mentally unsound when the will was made, but not otherwise. * * *" 61 Tex. Jur.2d 126, § 25.

" * * * A person need not be of a high order of intelligence to dispose of his property by will. The tests regarding

competency to contract are not applied in determining the question of testamentary capacity, and less mental capacity is required generally to enable a person to make a will than to make a contract. Nevertheless, if it appears that a decedent was incapable of giving consideration to the relevant facts regarding his property and his beneficiaries, the propounded instrument will be denied admission to probate." 61 Tex.Jur.2d 118, § 20.

" * * * Evidence of delusions is probative on the issue of a testator's soundness of mind under statutory requirements. But delusions are not a ground of attack against the probate of a will, except as they indicate a lack of testamentary capacity. Consequently, delusions suffered by a testator at the time of the execution of his will do not invalidate it if they were unrelated to his property and to the natural objects of his bounty. A will must be rejected, however, if the maker is shown to have been prevented from making an accurate appraisal of his natural obligations as a result of delusions." 61 Tex.Jur.2d 136, § 30. See also 61 Tex.Jur.2d 141, § 34 and cases cited.

"There are no limitations on the right of a person of sound mind to make whatever testamentary disposition of his property he wishes. This right is not subject to the decision of any tribunal, and a testator may give his property by will to whomever he desires, regardless of natural ties, so long as he does not violate any statutory or constitutional rights of his spouse or of those claiming under him. Accordingly, if he wishes to do it, a testator may disinherit his children by the provisions of his will, regardless of the generally accepted view that the natural impulse of a normal man is to bestow his final benefactions on the persons and in the order pointed out in the statutes of descent and distribution." 61 Tex.Jur.2d 114, § 17.

"The evidence is utterly insufficient to destroy the prima facie case made by appellant, and to establish the insanity of the testatrix at the time the will was executed. The testimony of the witnesses who were present when the will was executed was to the effect that the testatrix was perfectly sane at the time she executed the will, and that she was fully apprised of its contents. No delusions which could have affected testatrix and have induced the execution of the will were shown by the contestants. The testimony of the contestants was of such an indefinite character that, even when taken with the suspicious circumstances that the will was drawn by the husband of the beneficiary and that she was not related by blood or marriage to the testatrix, did not justify the verdict." Navarro v. Garcia, 172 S.W. 723 (Texarkana Civ.App., 1914, no writ). See also Vance v. Upson, 66 Tex. 476, 1 S.W. 179.

The opinion in Specia v. Specia, 292 S.W.2d 818 (San Antonio Civ.App., 1956, Ref. n. r. e.), by Justice Pope stated: "The time of the occurrences testified about is of importance. The record shows overwhelmingly, by witnesses and documents, that testator was competent on May 9, 1944. The evidence of incompetency loses its strength when we examine it against the standard of the definition as stated in the court's charge.

"A considerable number of will cases leads us to the conclusion that courts have manifested no hesitancy to reverse a case even where stronger proof of incompetency is present. In re Boultinghouse's Estate, Tex.Civ.App., 267 S.W.2d 614; Bell v. Bell, Tex.Civ.App., 248 S.W.2d 978; * * *."

In Price v. Johnston, 352 S.W.2d 864 (San Antonio Civ.App., 1961, Dism.), Judge Pope wrote: "The evidence shows that the testatrix, of her own free will, went to the office of the attorney who had counseled her and her husband, then deceased, for more than twenty years. She discussed her property and her will at length, with the attorney, and later returned to execute the formal will. By her will,

**940**

testatrix left one-half of her property to contestant in trust, and the other half to contestees in trust. These transactions were without the knowledge of any of the beneficiaries. Her testamentary capacity was proved by the unshaken testimony of five witnesses. Contestants have done no more than prove that the testatrix was old and sick. These bare facts defeat neither the testatrix's capacity nor her freedom to act." See Carr v. Radkey, 393 S.W.2d 806 (Tex.Sup., 1965) as to proper questions concerning testamentary capacity and 36 T.L.R. 1—"Testamentary Capacity: Evidentiary Aspects."

In Green v. Dickson, 208 S.W.2d 119, 124 (Galveston Civ.App., 1948, Ref. n. r. e.). "A testator may be old and infirm, weakened in energy and impaired in his senses, but, if he responds to the test which is applied to human beings in the ordinary affairs of life, the disposition of his property will be respected. 'It is not for juries nor courts to say how property should be passed by will. They can do no more than see that the testator's mentality meets the law's tests.' Whitney v. Murrie, Tex.Civ. App., 264 S.W. 270, 274."

In the case of McCannon v. McCannon, Tex.Civ.App., 2 S.W.2d 942, (1927, Dism.) Justice Lane, in speaking for the Galveston Court of Civil Appeals stated: "It must be kept in mind that the issue is, not whether the testator was, at the time of executing the will, of 'sound mind,' as that term is generally understood in its broadest sense, but whether or not he was capable at such time of understanding that he was making his will, the nature and extent of his property, the objects of his bounty, and the disposition he was making of his property. Imperfect memory, caused by sickness or old age, forgetfulness of the names of persons a testator has known, idle questions or statements, or requiring a repetition of information, will not be sufficient to establish incompetency, if he has sufficient intelligence remaining to understand the act he was performing, the property he possessed, the disposition he was making thereof, and the persons or objects of his bounty * * *."

We think it plain from the record in this case that the finding of the jury is unwarranted in that there is no evidence in support of it and that a finding to the contrary conclusively appeared from the evidence. Therefore the judgment will be reversed and judgment admitting the will to probate will be rendered here. If, contrary to what we have held, there is some evidence in support of the finding we then would hold that the verdict is so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust.

Reversed and rendered.